**In the United States District Court**

**Eastern District of Virginia**

**401 Courthouse Square, Alexandria, VA 22314**

FILED

Adaeze Nwosu      *
1802 Vernon St      *
Washington, DC, USA 20009    *
*Plaintiff*      *
     *
     *
T: 2028554226      *
E: ireoma@gmail.com      *
     *
     *
v.      *   CIVIL ACTION NO:
     *
     *   1:24CV 1264

1. Hilton WorldWide, Inc.
    1775 Tysons Blvd FL 7, McLean, VA, 22102 - 4285, USA
    <u>Registered Agent:</u>
    Corporation Service Company
    251 Little Falls Drive, Wilmington
    New Castle, DE, 19808
    ***Defendant 1***

2. Chris Song
    950 New York Ave NW, Washington, DC 20001
    ***Defendant 2***

3. Nancy Orlarei
    950 New York Ave NW, Washington, DC 20001
    ***Defendant 3***

4. Marriott International, Inc.
    7750 Wisconsin Avenue,
    Bethesda, MD, 20814
    <u>Registered Agent:</u>
    The Corporation Trust Incorporated
    2405 York Road
    Suite 201
    Lutherville Timonium MD 21093-2264
    ***Defendant 4***

5. The Ritz-Carlton Hotel Company, L.L.C.
    Registered Agent
    Corporation Trust Center 1209 Orange St,
    Wilmington, New Castle, DE 19801
    ***Defendant 5***

```
                                                    *
6.  Roman Dauze                                     *
    Tysons Corner,                                  *
    1700 Tysons Corner Blvd, McClean, VA, 22102     *
    Defendant 6                                     *
                                                    *
7.  Emma Poplin                                     *
    3100 S St , NW, Washington, DC 20007            *
    Defendant 7                                     *
                                                    *
8.  Rishi Malhotra                                  *
    3100 S St , NW, Washington, DC 20007            *
    Defendant 8                                     *
                                                    *
9.  David Morrison                                  *
    1100 Pennsylvania Avenue NW, Washington, DC     *
    20004                                           *
    Defendant 9                                     *
```

10. *John Doe(s)  and/or John Doe(s) Inc/Corp/LLC*


*22 July 2024*

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*       \*       \*         \*


**Jury Trial Demanded**

2

**Complaint: Fraud (constructive & actual), Unjust Enrichment, Harassment, Gross Negligence, Unfair Business Practices, Breach of Implied and Express Warranty, Violation of Anti-Trust Acts**

1. *Background of Parties,*

1.1.   Ms Nwosu (Plaintiff) is an international businesswoman, maintaining a portfolio of global businesses across the hospitality, luxury lifestyle and marketing industries. She is a "Diamond" member (the highest tier membership) with the Hilton Hotels Corporation and has had vast experience as a guest with the hotel, across their different brands across three continents, in Africa, Americas and Europe on her business travels. As a self-employed, working class professional woman, her stays are self-funded, meaning her expenses are not subsidized or funded by an employer. Ms Nwosu began repeatedly staying with the hotel chain in December 2022 after she was impressed by her Hilton stay in the Seychelles Mahé Island. Since 2023, when her gold jewelry was stolen at the Hilton Munich, Germany, Ms Nwosu has noticed a persistent decline in services afforded guests meanwhile the Hilton Worldwide Holdings annual gross profit has been steadily increasing since 2022: from (c. $7 billion to c. $9 billion in 2023).

1.2.   According to their SEC statement, "the Hilton Worldwide, Inc "Hilton" is one of the largest and fastest growing hospitality companies in the world, with 5,284 properties comprising 856,115rooms in 105 countries and territories as of December 31, 2017. Our premier brand portfolio includes: our luxury and lifestyle hotel brands, Waldorf Astoria Hotels & Resorts, Conrad Hotels & Resorts and Canopy by Hilton; our full service hotel brands, Hilton Hotels & Resorts, Curio - A Collection by Hilton, DoubleTree by Hilton, Tapestry Collection by Hilton and Embassy Suites by Hilton; our focused service hotel brands, Hilton Garden Inn, Hampton by Hilton, Tru by Hilton, Homewood Suites by Hilton and Home2 Suites by Hilton; and our timeshare brand, Hilton Grand Vacations. As of December 31, 2017, we had approximately 71 million members in our award-winning guest loyalty program, Hilton Honors."

1.3.   Defendants 2 and 3, namely Chris Song and Nancy Orlarei respectively, were employees of Defendant 1's subsidiary, Conrad Hotels and Resorts, located at 950 New York Avenue, Washington, D.C, and participated in fraud and conspiracy to

defraud the plaintiff during the plaintiff's stay in July 2024. Both parties were relocated to the Washington D.C. Conrad Hotel in May/June 2024, after the Conrad Hotel & Resorts Midtownin Manhattan New York failed to uphold five star luxury hotel standards, in just four short years, and was derobed of its Forbes Five Star "Certification" in 2024. Ms Nwosu had stayed at the then Conrad Midtown New York, on May 4 2024, complained to its front desk manager of its below standard services. Following lapses in service qualities, 1 month later on June 4 2024, the Hilton withdrew its managegment services, and the property was scooped up by Marriot International, Inc, *defendant 4,* in defendant 1's stead. The plaintiff also brings a discrimination claim against defendant 2 for harassment, conspiracy and fraud while she was a guest on the property in June 27 2024.

1.4.   Defendant 4, the Marriott International Inc., is the parent company of Defendant 5, The Ritz-Carlton where the plaintiff also stays since 2023 on business trips to the District of Columbia, and is a competitor to Defendant 1. Like Defendant 1, the plaintiff has substantial evidence over the course of her stays for illegal activities such as fraud, breach of contract, unjust enrichment, breach of implied and express warranty *inter alia.*

1.5.   Defendant 6, 7, 8 are employees of Defendant 5, who conspire to comit fraud against the plaintiff, and discriminate against the plaintiff, and breach contractual agreements provided by defendant 4's loyalty programs

1.6.   Defendant 9, the John Does, are for unknown members, who participated in the torts against the plaintiff and whom she does not know at the present time, and is listed for ease of serving summons at a later time.

2.   *Nature of Action*

2.1.   The plaintiff brings this action/complaint of fraud (constructive and actual), breach of express and implied warranty, breach of contract, unjust enrichment, negligent misrepresentation, civil conspiracy for fraud and aiding and abetting such fraud, thereof, harassment, antitrust violations and violations of the consumer protection act for Virginia, and the District of Columbia, where the torts occurred, and/or under 18 U.S. Code § 1346 - Definition of "scheme or artifice to defraud" and 18 U.S. Code § 1349 - Attempt and conspiracy.

2.2.   The plaintiff brings these aforementioned counts against the defendant 1 – 3, in her capacity as a Hilton "Diamond" member, the highest membership category, shy of lifetime Diamond, after having experienced multiple of the corporation's brands portfolio worldwide and spending in excess of $50,000.00 in repeated stays with the Hilton since December 2022. In this capacity the plaintiff has experienced, rather unfortunately, a repeated lapses in service qualities, some of which, like negligence and theft ended up being proximate causes for $400,000 loss by the plaintiff. The plaintiff files this suit timely based on her concatenation of her experiences since 2023, which demonstrates the defendant 1's substitution of consumer centric, hospitality service for corporate greed. Since in 2022, Defendant 1's profit increased by $2 billion dollars, while the plaintiff has witnessed its leased, managed and owned properties succumb to disrepair; cutback in basic amenities and basic service standards, including housekeeping and cleaning standards in its flagship Hilton brand, all the while positing that such brands like the Hilton are full service.

2.3.   The plaintiff brings similar complaints against defendants 4 – 8 in her capacity as a Marriott Bonvoy "Gold Elite" Member, wherein she has experienced precarious and frivolous implementation of the alleged Gold Elite benefits, that the availment of such warranties become akin to "playing the house" and are albeit illusive and fraudulently misrepresented.

2.3.1.   For defendants 1 and 4, the plaintiff learned its employees are incentivized and/or rewarded and/or promoted based on actual cash sales, causing them to jettison ethics, warranties of loyalty programs, and plainly defraud and harass guests, engage in illegal pricing such as baiting and switching, while they falsely advertise to bait consumers into joining their fraudulent loyalty programs. Ultimately, defendants 1 and 4 have crafted a likely ponzi scheme, where they, the parent companies, are the players of the ponzi/pyramid scheme, and the unsuspecting consumers are the later investors and the employees are the early investors who benefit from kickbacks, payoffs at the expense of the unsuspecting consumers, like the plaintiff.

2.3.1.1.   "Bait and switch" advertising is grounds for an action of common-law fraud, unjust enrichment, and sometimes breach of contract. A "bait and switch" is also a violation of the Consumer Fraud and Deceptive Business Practices Act.

2.3.2.   (1) the seller represented in its initial proposal that they would rely on certain specified employees/staff when performing the services; (2) the recipient relied on this representation of information when evaluating the proposal; (3) it was foreseeable and probable that the employees/staff named in the initial proposal would not be available to implement the contract work; and (4) employees/staff other than those listed in the initial proposal instead were or would be performing the services.

2.4.   The suit also brings anti-trust violations for various unethical pricing such as <u>inadequately justified</u> dynamic/yo-yo pricing, *allegedly* using Artificial Intelligence, which but serves to obscure transparency in pricing, promotes unjustified inflationary pricings and diminishes consumer's hard earned disposable incomes. In fact, other states have banned and/or are attempting to ban these sort of runaway pricing schemes that serve to devalue unjustly consumer dollars and drive unnecessary inflation, and because of its potential violations of Sherman 1 and 2 Acts, and actual violations of the Clayton Act see <u>https://spectrumlocalnews.com/nys/central-ny/politics/2024/03/01/n-y--lawmaker-introduces-bill-amid-wendy-s-planned-dynamic-pricing</u> and <u>https://www.restaurantdive.com/news/new-york-state-ags-proposed-rule-could-restrict-dynamic-pricing-new-york/644208/</u>.

2.5.   Thus, this complaint also contains anti-trust violations vis a vis, the Clayton Act and The Robinson Patman Act, as both parent companies engage in never ending acquisitions and conversion of hotel brands under their portfolio, stifling competition and limiting choices for travelers, flattening the distinction between luxury, and midscale hotel chains to their cost advantage, all the while providing substandard service delivery across all hotel brand categories.

2.6.   This suit is timely as lapses in the breach of contract, and failure to honor its warranties by the 1st and 4th defendants have already been adjudicated and settled in favor of the plaintiffs, See case Elder vs. Hilton 2017, yet these defendants refuse to learn from their previous mistakes, thus compelling this similar case's requirement for more stringent punitive damages.

3.   *Jurisdiction*

3.1. The plaintiff brings this complaint into the District Court for Eastern Virginia based on federal question jurisdiction under 28 USC 1331: Federal question because the district courts have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States. The defendant 1 is a Delaware corporation **headquartered** in Eastern Virginia with location 1775 TYSONS BLVD FL 7, Mc Lean, VA, 22102 - 4285, USA. Defendant 4 is headquartered in Maryland, and owns/operates hotels in Eastern Virginia, such as defendant 5, the Ritz-Carlton L.L.C with a branch located at 1700 Tysons Boulevard, McClean, Virginia, where torts were also committed against the plaintiff. Federal jurisdiction is appropriate as both holding companies have branches /subsidiaries along state lines and engage in interstate commerce.

4. *Counts & Violations*

4.1. Fraud/Misrepresentation, Negligent Misrepresentation against defendants, pursuant to US Code 18 U.S. Code § 1346 Scheme or Artifice to Defraud and 18 U.S. Code § 1349 – Attempt & Conspiracy,

4.2. Harassment against defendant 2

4.3. Breach of Virginia Consumer Protection Act of 1977, Breach of DC Consumer Protection Act

4.4. Negligence, Gross Negligence, Wanton Negligence

4.5. Unjust Enrichment

4.6. Discrimination and Violation of Common Law Inn Keeper Laws

4.7. Breach of Implied, Express Warranties (Breach of Contract)

5. *Statement of Claims*

5.1. The flagship Hilton brand gained popularity with upper middle class baby boomer Americans as a dependent brand that could deliver 4-star hotel quality at 2 star prices. Marriott, a rival grew popular on a similar branding style. In recent years, both companies have pursued an aggressive acquisition strategy to appeal to luxury consumers, like the plaintiff and gen Z and millennials[1].

---

[1] See summary of Marriott's acquisitions here including expansions of luxury portfolios st. Regis, and defendant 5, Ritz Carlton, L.L.C

5.2.   The problem now is that the reverse is true, wherein defendant 1 and 4 are acquiring and expanding brands which they <u>advertise</u> as luxury and running them like 2/3 star hotels, including defendant 5,  because they evidently cannot uphold the standards expected of the luxury hospitality of their boutique rivals, to which customers are acquainted, and even which their advertisements promise. This is evident in defendant's one closures of its luxury hotels due to lackluster and/or substandard service delivery, as evident in the Conrad Midtown New York, which the plaintiff personally experienced, her lackluster experience in the Waldorf Astoria Rome Cavalieri Resort in May 2024, where the bathroom upon check in was hardly operational, and in Waldorf Astoria in/around June 5th 2024, wherein the plaintiff checked into a dirty unvacuumed riddled room with fresh carpet stains and visibly unclean bath that was permanently stained. These just mark the experience of the plaintiff, non inclusive of the publicly available complaints of deplorable standards in similar Waldorf Astoria in Edingburgh, Scotland which was forced to drop the luxury Waldorf Astoria brand in June 2024, to a curio collection, after a persistent string of complaints since 2022[2]. The Curio collection hotels are a 6 foot drop **downgrade,** from the Waldorf Astoria, and just adds further evidence of Defendant's inability to operate as a luxury chain despite persistently misleading customers and raising expectations[3].

> *Figure 1 Excerpt from Hilton 2021 SEC filing showing ranking of its brands*

---

[2] https://www.tripadvisor.com/Hotel_Review-g186525-d188782-Reviews-or20-The_Caledonian_Edinburgh_Curio_Collection_by_Hilton-Edinburgh_Scotland.html

[3] https://www.thecaterer.com/news/caledonian-edinburgh-curio-collection-hilton



sec.gov

The goal of each of our brands is to deliver exceptional customer experiences and superior operating performance.

| Brand(1) | Chain Scale | December 31, 2021 Countries/ Territories | Properties | Rooms | Percentage of Total Rooms | Selected Competitors |
|---|---|---|---|---|---|---|
| Waldorf Astoria | Luxury | 15 | 31 | 8,640 | 0.8% | Four Seasons, Mandarin Oriental, Penin Rosewood Hotels & Resorts, |
| LXR | Luxury | 7 | 9 | 1,274 | 0.1% | Leading Hotels of the W Legend Preferred Hotels & Small Luxury Hotels of The The Luxury Collectio |
| Conrad | Luxury | 21 | 42 | 15,085 | 1.4% | Fairmont, Intercontinen JW Marriott, Park Hyatt, S |
| Canopy | Upper Upscale | 10 | 35 | 6,034 | 0.6% | 25hours Hotels, Hyatt Ce Joie de Vivre, Kimpto Le Meridien, Renaissa |
| Signia Hilton | Upper Upscale | 1 | 1 | 1,009 | 0.1% | Grand Hyatt, JW Marri |
| Hilton | Upper Upscale | 94 | 598 | 221,782 | 20.6% | Hyatt, Hyatt Regency, Ma Omni, Sheraton |
| Curio Collection | Upper Upscale | 28 | 116 | 23,205 | 2.2% | Autograph Collection, Desig Destination Hotels, The Unbound Collecti |
| DoubleTree | Upscale | 50 | 635 | 144,901 | 13.5% | Courtyard by Marriott, Crowne Plaza, Delta, Sheraton, Wyndham |
| Tapestry Collection | Upscale | 9 | 73 | 8,638 | 0.8% | Joie de Vivre, Tribute Por |
| [illegible] | Upper Upscale | 5 | 258 | 59,651 | 5.6% | Hyatt Regency, Marriott, Shera |
| Tempo | Upscale | — | — | — | —% | AC Hotels, Aloft, Cambria, He |
| Motto | Upper Midscale | 1 | 3 | 871 | 0.1% | CitizenM, Freehand, Gene Hoxton, Moxy, tommie, |
| Hilton Garden Inn | Upscale | 55 | 940 | 137,867 | 12.8% | Aloft, Courtyard by Marriott, F Holiday Inn, Hyatt Pla |
| Hampton | Upper Midscale | 33 | 2,765 | 297,830 | 27.7% | Comfort Suites, Courtyard by Fairfield Inn, Holiday Inn Express, S |
| Tru | Midscale | 2 | 214 | 20,843 | 1.9% | Avid, Best Western, Comfort In La Quinta, Quality Inn, Sleep Inn, Win |
| Homewood Suites | Upscale | 4 | 526 | 60,085 | 5.6% | Element, Hyatt House, Residence Inn, |
| Home2 | | | | | | |

*Figure 2 String of poor reports of the struggling Waldorf Astoria in Edingburgh, now Curio Collections*

tripadvisor.com

< See all 176 hotels in Edinburgh

The Caledonian Edinburgh, Curio Collection by Hil... Special offer Deals About Location Reviews Check availability

recent traveler reviews.

**Trevor M** wrote a review May 2024

Randalstown, United Kingdom • 2 contributions • 2 helpful votes

**Super location, amazing staff, 3* room and 1* breakfast!**

3 hrs + delay to check into our room due to a maintenance issue. Eventually advised by duty manager that our original room would be unavailable. We booked a deluxe king room. Duty manager was very professional and offered a number of complementary items by way of apology. The room we were eventually checked into 170 was a let down to say the least. Very basic decor,limited furniture and amenities and tiny bathroom with a sliding door.
Room felt as if it would not normally be used and had a musty smell when we got into it. Raised these issues with reception but no alternative rooms were available due to hotel being fully booked. The is hotel location is brilliant, communal areas, lobby, restaurants are beautiful with
Read more

**Date of stay:** May 2024

1

**Response from Nitin R, General Manager at The Caledonian Edinburgh, Curio Collection by Hilton**

Responded May 19, 2024

Dear 517trevorm, Thank you for taking the time to write your review, we greatly value and appreciate your feedback. I am both saddened and concerned to learn that we failed to meet your expectations on this occasion, kindly accept my sincerest apologies. I am sorry to hear that you experienced some
Read more

Report response as inappropriate

**Rodrigo B** wrote a review May 2024

**An outdoor lover's guide to Edinburgh**

**Dive into some of the Scottish capital's best...**

Read now

*Figure 3 Evidence of duplicitous practices by the hilton from other customers*

tripadvisor.com

< See all 176 hotels in Edinburgh

The Caledonian Edinburgh, Curio Collection by Hil... Special offer Deals About Location **Reviews** Check availat

Report response as inappropriate

This response is the subjective opinion of the management representative and not of Tripadvisor LLC.

Rodrigo B wrote a review May 2024
2 contributions • 3 helpful votes

**They offered a Porto of 20 years but served a 10 years one.**

We were a group of almost 20 "rude" Chilean celebrating a birthday dinner of a generous friend.

Finishing the dinner a humble waiter offered to man of the night a Porto, showing a bottle of 20 years together with a group of 4 or 5 glasses already served with a dark liquid.

Because the first 4 or 5 glasses were not enough for all the drinks lovers, the same humble waiter appeared offering glasses with a less dark liquid.

Read more

**Date of stay:** May 2024

This review is the subjective opinion of a Tripadvisor member and not of Tripadvisor LLC. Tripadvisor performs checks on reviews as part of our industry-leading trust & safety standards. Read our transparency report to learn more.

0

Response from Nitin R, General Manager at The Caledonian Edinburgh, Curio Collection by Hilton
Responded May 10, 2024

Dear Rodrigo B, We were disappointed to learn about your recent experience with us at Waldorf Astoria Edinburgh - The Caledonian and we would like to extend our sincere apologies for the inconvenience. We take guest feedback very seriously and we assure you that appropriate measures

Read more

Report response as inappropriate

This response is the subjective opinion of the management representative and not of Tripadvisor LLC.

An outdoor lover's guide to Edinburgh

Dive into some of the Scottish capital's best.

Read now

*Figure 3 Evidence of duplicitous practices by the hilton from other customers*

tripadvisor.com

< See all 176 hotels in Edinburgh

The Caledonian Edinburgh, Curio Collection by Hil... Special offer Deals About Location **Reviews** Check availability

Travelbug35805 wrote a review Jun 2024
Chicago, Illinois • 142 contributions • 83 helpful votes

**Disappointing**

Don't let the photos fool you. We checked in to our $678 room and were shown to an old matchbox size room. I requested a change and again was given the same type of rooms, only this one had two narrow windows. We were finally given a "king" room instead of a queen. I should also mention that as an Amex platinum cardholder, we are entitled to an upgrade. The hotel finally gave us an appropriate room (in spite of the fact that they were "fully booked". The room was larger and had been refurbished. There were oddities about it: no soap dish in the shower, and no area to dry your towel, but being a city hotel space is at a premium. The breakfast was a redeeming feature. Expansive buffet and á la carte menu. The service was good

Read more

**Date of stay:** June 2024

This review is the subjective opinion of a Tripadvisor member and not of Tripadvisor LLC. Tripadvisor performs checks on reviews as part of our industry-leading trust & safety standards. Read our transparency report to learn more.

1

Response from Nitin R, General Manager at The Caledonian Edinburgh, Curio Collection by Hilton
Responded 3 weeks ago

Dear Travelbug35806, We were disappointed to learn about your recent experience with us at The Caledonian Edinburgh and we would like to extend our sincere apologies for the inconvenience. We take guest feedback very seriously and we assure you that appropriate measures will be taken to

Read more

Report response as inappropriate

This response is the subjective opinion of the management representative and not of Tripadvisor LLC.

1 2 3 4 5 6 ...

Not the right property for you?

5.3.    The general manager from the failing Waldorf Astoria in Edinburgh, Dale McPhee was brought in to run the failing Conrad Hotels in DC this May 2024, which had evidently been running without a general or operations manager. In the press, the Hilton publicly conceals its luxury management and operational failures to deliver the services it advertises with rosy, omissive and misleading verbiage: *"The property will also be rebranded into a Curio Collection by Hilton hotel in a move that would "provide an opportunity for the Caledonian to further elevate its heritage and position", the group said[4]."*

5.4.    Under Virginia law, a plaintiff seeking to recover for fraud must allege: "a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled." Glaser v. Enzo Biochem, Inc., 464 F.3d 474, 477 (4th Cir. 2006) (citing Richmond Metropolitan Authority v. McDevitt Street Bovis, Inc., 256 Va. 553, 507 S.E.2d 344, 346 (1998)). A claim for constructive fraud requires the same allegations, except instead of pleading that the false representation was made intentionally and knowingly, "the plaintiff is only required to plead that the false representation was made innocently or negligently." Sales v. Kecoughtan Hous. Co., 279 Va. 475, 690 S.E.2d 91, 94 (2010). In addition, "[a]n action.

5.5.    Similarly under District of Columbia law, in order to state a claim of common law fraud (or fraud in the inducement) under District of Columbia law, a plaintiff must plead that: The defendant made a false statement of material fact with knowledge of its falsity; and/or with the intent to deceive ("Where a party innocently misrepresents a material fact ... without reasonable grounds for believing it to be true […] such representation will support an action for fraud.") (citations omitted); Restatement (Second) of Torts § 539(1) (1977),  as cited in *Boomer Dev., LLC v. Nat'l Ass'n of Home Builders of the United States, 258 F. Supp. 3d 1 (D.D.C. 2017).* Under District of Columbia law, a misrepresentation is material if either:  (a) It is likely to induce a reasonable person to manifest assent. (2)  The  defendant knows that it is likely to induce the recipient to manifest assent (*Id*). Under federal law, 18 U.S. Code § 1346, scheme or artifice to defraud, the U.S Supreme Court, US v. Rybicki, 354 F. 3d 124 - Court of Appeals, 2nd Circuit 2003 upeld the code includes a scheme or artifice to deprive another of the intangible right of honest services

---

[4] https://www.thecaterer.com/news/caledonian-edinburgh-curio-collection-hilton

5.6.     With regards to the Virginia Consumer Protection Act of 1977, Consumer transaction" means:

5.6.1.   " 1. The advertisement, sale, lease, license or offering for sale, lease or license, of goods or services to be used primarily for personal, family or household purposes;

"Goods" means all real, personal or mixed property, tangible or intangible.

"Services" includes but shall not be limited to (i) work performed in the business or occupation of the supplier, (ii) work performed for the supplier by an agent whose charges or costs for such work are transferred by the supplier to the consumer or purchaser as an element of the consumer transaction,

"Supplier" means a seller, lessor, licensor, or professional who advertises, solicits, or engages in consumer transactions, or a manufacturer, distributor, or licensor who advertises and sells, leases, or licenses goods or services to be resold, leased, or sublicensed by other persons in consumer transactions.

A. The following fraudulent acts or practices committed by a supplier in connection with a consumer transaction are hereby declared unlawful:

6. Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model;

In any action brought under this subdivision, the refusal by any person, or any employee, agent, or servant thereof, to sell any goods or services advertised or offered for sale at the price or upon the terms advertised or offered, shall be prima facie evidence of a violation of this subdivision.

14. Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction"

16. Failing to disclose all conditions, charges, or fees relating to:

a. The return of goods for refund, exchange, or credit. Such disclosure shall be by means of a sign attached to the goods, or placed in a conspicuous public area of the premises of the supplier, so as to be readily noticeable and readable by the person obtaining the goods from the supplier. If the supplier does not permit a refund, exchange, or credit for return, he shall so state on a similar sign."

5.7.     **Fraud (Ponzi Schemes) and Breach of Implied & Express warranty (Breach of Contract) & Deceptive Pricing Practices (Unfair and Deceptive Trade Practices), Negligence**

12

5.7.1. The plainitff avers that the defendants 1 and 4 breached Code of Virgirnia § 8.2-313: Express warranties by affirmation, promise, description, sample, [wherein] *(1) Express warranties by the seller are created as follows:*

> *(a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.*

> *(b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.*

> *c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.*

> *(2) It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.*

5.7.2. The defendants 1 and 4 conducted the acts listed in clause 5.7 by repeatedly denying upgrades, gifts, concessions, violating their terms and conditions at material times when the plaintiff attempted to avail of the warranties provided by their loyalty point systems, in her status as a "Diamond" Hilton Honors member and "Gold Elite member,

5.7.3. The plaintiff has been repeatedly denied upgrades at the Hilton being informed that certain rooms are exlcuded for upgrades although these are not advertised, and are omitted from the welcome letters and adverts on the company's website of the benefits of the loyalty programs

5.7.4. Defendants 1 and 4 also incentivize staff to deny one upgrades by rewarding them/ promoting them based on actual cash sales so consumers are unsuspecticaly blocked from availing of their points, and instead are steered away or outrightly defrauded.

## 6. Statement of Facts/ Plaintiff's Affidavit in Support of Counts against named Defendants

6.1. Plaintiff string of poor and fraudulent experiences at Defendant's 1 Conrad Hotel & Resorts brand, including the plaintiff's stay at the Conrad, Washington, DC June 22 – July 1, 2024 and the Conrad in Algarve, Portugal in May 2024.

6.2. During her first stay at the Conrad Washington DC, from June 16th June – 23rd June 2024, Ms Nwosu had paid for the Sakura lounge, whose added lounge fee provides breakfast and dinner.

6.3. Ms Nwosu stayed in a 800sqft suite with a park view, receiving lots of natural sunlight, and despite the summer heat and large glass windows, the room stayed cool because of the functioning AC.

6.4. During the course of her stay, Ms Nwosu observed that hotel employees were in the practice of coming to the lounge during lounge hours or shortly after and sneaking food prepared for guests out of the lounge for their personal consumption

6.5. By their acts of sneaking food out, i.e. trying to hide take away packs of food and walking briskly out of the lounge, and/or carrying plates into the lounge toilet, Ms Nwosu knew they knew their practices of taking what was reserved for guests were wrong and inappropriate, especially in a 5 star hotel.

6.6. The staff being able to avail of guest food Ms Nwosu had to bay at least $300 a night for, plus extra $300 for the Sakura lounge constitutes a violation of consumer protection laws because unbeknownst to Ms Nwosu, the Hilton had an alternate avenue to availing of such amenities without paying – all Ms Nwosu had to do rather than waste her hard earned money was greet people in the lounge as an employee and clean up after guests.

6.6.1. When she asked Nancy Orlarei if there was an alternate path to obtaining the same amenities without paying for them, and again re-exposing the illicit behavior of the staff, Nancy did not respond to Ms Nwosu's complaint. This act alone violates Virginia consumer protection act § 59.1-200 (8) whereby defendant 1 advertised goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised

6.7. Ms Nwosu also noted that her turn down services, which is part of the services she had paid for, and *expected,* at the hotel, were missed and/or incompletely done by the turn down staff. On one night, she informed Mr Edwards, who mentioned all the housekeeping staff had closed for the day, but would ensure they serviced her room for the rest of her stay.

14

6.8.   However, turn down services remained lackluster, at times trash wouldn't be taken out, the bed would not have been serviced, the nightly gifts not placed, or ice would be missing, or the drapes not closed. Thus, the services she was paying for and expecting, was not being delivered, and when done, were below the hotel's recognized standard, and which the staff admitted, and yet could not sufficiently correct and render, if at all. This is in violation of Virginia consumer protection act § 59.1-200 6. Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model.

6.9.   The final straw that broke the camel's back on this stay, was when Ms Nwosu sought to extend her stay and avail of her Hilton honors points. To this effect she had notified the front desk manager, Mr Edwards, to close out the existing booking so her points would post ontime and she could redeem it. However, on 21st June, Mr Edwards gave Ms Nwosu lots of excuses, and said his work phone broke that morning, and did not see her messages requesting the stay to be extended and redeemed with points, and ensuring she booked the right room category through the app, to retain the same room. Ultimately, though Ms Nwosu went ahead and made a fresh reservation through the app, she was yet debited or a stay at a full cash rate of over $1000, unbeknownst to her, and without her authorization.

6.10.   This came, after Ms Nwosu complained to the front desk manager, prior checking in that it seemed the Hilton staff grieved customers who booked with points because they either try to withhold the complimentary upgrades they advertise by telling them rooms are not available, or steering them away to reserve their points for later and pay cash instead. While Mr Edwards tried to reassure her that was not her practice, on June 16th 2024, when she initially checked in, it ended up manifesting as explained in the aforementioned clause.

6.11.   Subsequently, after complaining for the unauthorized debit on her card, and the lapses in services, including omitted and substandard services, Chris Song and the Guest Relations Manager, Alejandra, initially tried to offer Ms Nwosu 40,000 points and a free night's stay in a standard room. Ms Nwosu declined the offer, stating she was similarly offered 40,000 points in the Conrad Midtown, NY, in May 2024 and instead told them to improve their services and give her a refund. Unfortunately, the Conrad Midtown closed for lapses in service standards and omissions anyway. Ms Nwosu mentioned she wasn't interested in points to patch poor service and that the reasons she opted for "5 star hotels" was so she could focus on the business she was

in town for, get it done in a timely manner, and be assured that she would not be distracted with poor service experience

6.12.   In this case, both the guest Relations manager and the assistant front desk manager, Chris song, ceded that truly the standards Ms Nwosu had met, were not the hotel's standard, and conceded to give her a partial refund and assurance that on her next stay she would **not witness the lapses she had seen on this stay, and would take steps to remedy the situation** and invited her back to the hotel in DC the following week, when she would return to town. Ms Nwosu took them for their word.

6.13.   On/Around June 26 2024, Ms Nwosu returned to DC and wrote to Chris Song, Nancy Orlarei the Director of Rooms, and Alejandra specifically asking if the services issues and omissions, she had witnessed, had been fixed prior to booking. Chris assured her in writing that they had been addressed, and welcomed her booking.

6.14.   However, the next morning after the night she had checked in, Ms Nwosu saw yet again, hotel staff sneaking food reserved for guests into the bathroom of the lounge. Such acts of taking what belonged to guests, by staff was extremely sensitive for Ms Nwosu as a staff member had stolen Ms Nwosu's 3 day old one of a kind gold jewelry in Hilton Munich, 2023, and thus made Ms Nwosu extremely worried about the safety of her affairs, if the problem still persisted and the staff(s) they had allegedly cautioned continued.

6.15.   Ms Nwosu promptly brought the breach in service standard and behavior to the director of rooms, Nancy Orlarei after leaving the hotel to conduct her affairs. When Crucially, when Ms Nwosu confirmed from Nancy Orlarei that same day, that staff had no special permission to conduct such, she **asked for a refund immediately in writing on the stay given that she had just stayed one night out of the four nights**

6.16.   She also brought to Nancy's attention the non-working AC in the <u>living room</u> and copied Chris and Alejandra

6.17.   While Ms Nwosu was out of the hotel Nancy did not respond, and neither did Chris or Alejandra. Ms Nwosu just assumed they were taking care of the lapses and did not want her to check so she concentrated on her affairs.

6.18.   When she returned later in the evening back to the hotel room, she was surprised the room was still hot, her laundry had neither been picked up or returned, and there was no response whatsoever from Nancy or Chris or Alejandra.

6.19.   Confused, yet tired, she wrote to Nancy to elicit a response on her complaint, and Nancy wrote her a one liner saying someone would fix the <u>AC in the bedroom.</u>

6.20.   Ms Nwosu returning from a long day, was exhausted and perplexed as to why there had been no resolution, meanwhile staff were checking in guests as normal and no one said anything to her. Eventually she instructed Alejandra to check her phone with regards to the complaint. Alejandra mentioned she was off duty and could not address the recurrent lapses either, and simply referred her back to Nancy and Chris who were on duty and copied on the e-mail, and her assured her they would take care of her complaint

6.21.   Ms Nwosu ceded, and decided to focus on her affairs through throughout the business week, which she was in town for, trusting the hotel staff would not have lured her back to the hotel under false pretenses, and without intending to improve as they had mentioned. She left the hotel in the morning for her business in the morning, came back in the evening, yet her room was ever hot.

6.22.   In fact two of the Hilton employees who entered her room, Mr Roberto, and the housekeeping staff noted her room was uncharacteristically hot and apologized for the inconvenience.

6.23.   On Sunday June 30th, Ms Nwosu reported to a front desk staff, Mr Odingas that her room was still very hot, and he came up and witnessed that the AC in the living room was set to a lower temperature than the AC in the bedroom, yet was still not cooling as well.

6.24.   Odingas called on the radio for engineering to come to the room immediately, and upon arrival, the **engineering staff mentioned that was the first time,** he had received a request to that room for a non-working AC and **showed Ms Nwosu** the engineering room fixing requests for the past week; Notably, her room, room **1014, was not on there.** Thus, although Nancy, Alejandra and Chris all made Ms Nwosu believe that they had been sending engineering to her room and that her room air conditioning was fixed. **This was a lie.** The only reason Alejandra was not listed as a defendant was because she was off duty, and would had been relaying information based on input from Chris and Nancy.

6.25.   Ms Nwosu then reported the matter to Chris in person, whom she had been copying but had not seen physically until then. He mentioned he had been made aware of the matter, and offered Ms Nwosu a <u>fan.</u> It was then she knew Nancy and Chris had deceived her and conspired to defraud her all along. <u>Their silence, though</u>

<u>pretending to fix issues, had been intentional. They had lured her back to the hotel on the assurances that the lapses in services were addressed, wherein they actually were not, and carefully omitted that they had no intention of fixing them, all the while recognizing Ms Nwosu is busy during the day.</u> So their ploy evidently was to stall her, under pretenses, so as to not issue a refund and then mention that she had used the facilities, which is exactly what happened. See clause 4.2.29

6.26.   In fact Mr Song, took it upon himself to try to prove to Ms Nwosu that her AC was working, but because her room faced the sun it could not cool. Notwithstanding that at least three other staff had concluded that the room was uncharacteristically hot, and that Ms Nwosu's previous room from her previous stay, which had faced the sun and had more glass window cooled just fine.

6.27.   When Ms Nwosu refused Chris obvious lies, she told him she was stressed by all of this and was checking out and wanted to be alone. Chris <u>insisted</u> on following her to her room to the engineer, prove that the AC was working well.

6.28.   Ms Nwosu repeated to Chris that three of his staff, and herself had all born witness to the fact that the living room is HOT and the AC cannot cool it, and that no engineering had come all along, and she was not permitting anyone anymore since she wanted to rest and check out.

6.29.   Chris insisted on entering the elevator with her  to the 10th floor and followed her. **Irritated from what had risen to harassment, since Ms Nwosu had asked Chris to leave her alone,** <u>but he refused disrespectfully,</u> under the guise of pretending to fix her issue, though he had 3 days already. Upon noticing Chris followed her from the lift on the 10th floor and was **still** walking behind her to her room, after she had asked him to **stop,** she went down to the third floor lobby and met with the concierge, Ms Yvette Faulk, and recounted her stay and asked to leave and find an alternative. Ms Faulk concluded that Ms Nwosu was entitled to a refund and should not have witnessed **any** of the lapses in services **again**. She agreed to call an alternate hotel, the Waldorf Astoria, in the morning, when their managers would be back, to ensure they had fixed their issues and Ms Nwosu could be transferred to a hotel within the Hilton brand in the morning. She also promised to escalate the complaint with Dale McPhee the general manager.  Odingas mentioned Ms Yvette was discussing with Chris privately, and would call her room to confirm everything before she left, and advised Ms Nwosu could go upstairs.

6.30. Later that evening, Ms Nwosu waited and did not receive a call from Ms Faulk. Instead, she received an email from Chris stating that **he would not honor a request for a refund because Ms Nwosu had used the facilities.**

6.31. Upon returning to her room, she noticed the turn down service had been done, but **once again improperly and incompletely.**

6.32. Ms Nwosu mentioned she would sue for she had been effectively defrauded, and defrauded under conspiracies by the staff at the Conrad, especially Nancy and Chris, who had known of the issues of the previous stay, did nothing on subsequent stays though pretended to so, just so they could stall Ms Nwosu to stay longer and steal her money under false pretenses and by willful acts of omission, and deceptive utterances. The staff at the Conrad clearly had **no intention of improving their services, stopping lapses in quality standards, theft, etc and all the shortcomings Ms Nwosu had pointed out on her previous stay, and again on June 26th 2024, which Chris assured her they would have taken care of. All was a fraudulent misrepresentation. This violated** Virginia consumer protection act § 59.1-200, 6,7,8.

6.33. On July 1 2024, Ms Nwosu followed up on her complaint with Ms Faulk and the general manager dale McPhee, but neither responded.

6.34. Ms Nwosu checked out a day early, and yet she was still billed the full amount, and lost also the dollar equivalent of the points (over $1000), she had used for the booking (Exhibit 1).

6.35. Chris and Nancy's fraudulent actions in over billing her made her recall how the Conrad, Algarve Portugal had overbilled her for pet fees and security deposit in excess $750, even though she had settled her bill, and the daily pet fees etc were already included in that invoice, which she had settled. The Conrad Algarve attempted to justify the charge, and instead emailed Ms Nwosu proof that she had authorized that amount using someone else's credit card.

6.36. Ms. Nwosu explained the billing was wrong because they had charged a card unbeknownst to her and only found out because she noticed unrecognized charges on a card she had not authorized.

6.37. Although the Conrad Algarve had a printout of her invoice, with the charges fully settled, they never refunded her the excess of $750 amount (exhibit 2). Ms Nwosu was forced to file a charge back but soon forgot about it because she had other countries to travel to on her agenda.

<u>Falsely Advertised Services and Repeated Lapses in Quality Standards at the</u>
<u>Waldorf Astoria in Rome and DC</u>

6.38.   Ms Nwosu has had over 5 3-day or more stays at the Waldorf Astoria, DC between
2023 – 2024, and used to be her go-to hotel whenever she had to be in DC. However,
there would be lapses by staff upon check in, and the more she stayed, the more she
noticed the hotel falling into disrepair such as little yet important things that make
a 5 star hotel, 5 star: curtains began to drop off the curtain rack, furniture like sofas
would be missing from how it was advertised on the Hilton website, and <u>door</u>
<u>viewers for security would be blocked with tissue</u>, because the glass was broken
and their slippers became cheaper, their laundry papers became photocopies instead
of actual three ply papers with the carbon copies beneath (see images from
plaintiff's stay on January 17th 2024).

6.39.   Ms Nwosu reported these drop in standards to Mr Crosby, a front desk staff, their
long time concierge Fahad, who mentioned they would try to fix these lapses in
service, security, and quality standards for her next stay.



*Figure 4 cheap slippers*



*Figure 5 broken security door viewer, clogged with tissues*

6.40.   However, Ms Nwosu's next stay was worse. When she checked in June 2022, she
checked into a dirty room, the room was not vacuumed, there was visible hair in the

tub,  the tub that was previously always white had now developed stains and there was trash on the floor from the previous stay.

6.41.   This time, she was offered a complimentary upgrade by David Morrison, defendant 9,  the front desk manager to a $2000 suite for the night, instead of her $800 room, as a bait, since it would be complimentary for that night only, and subsequently they would switch the price. MS Nwosu declined the offer asked for a refund on the first night because of the gravity of oversight of checking into a dirty room, and drop in standards. She asked that the tub be fixed as this was her preferred room, and was already noted on her profile, so she did not want to go through hassles of seitching

6.42.   In an email on June 6th, 2024, she explained such lapses in drop in advertised luxury standards are costly on her time because then they try to get the housekeeper, director of housekeeping to speak with her, apologizing and eating into time meant for her business and she was not just going to keep condoning substandard services with placating yet patchy solutions such as points and upgrades (Exhibit 3).

6.43.   Ms Nwosu told the director of housekeeping to replace the stained tub, since she mentioned the stains could not come out and admitted yes previously, they were not there but had started to develop across tubs in the hotel.

6.44.   Ms Nwosu mentioned for the price of a suite for the night, the could easily buy a new one.

6.45.   Though they admitted the lapse in service standard, what happened next was very telling of defendant's 1 inability to understand and run 5 star luxury. A front desk staff called Ms Nwosu, whilst her do not disturb sign was on, to inform her that the price of her room had increased to $1000+ for the following night, then David, defendant 9, made an offer to downgrade her, *and still not fix the tub,* or even provide any assurances or give a time frame with which it would be fixed.

6.46.   Additionally, when Ms Nwosu first tried to book the stay, *before checking in,* she was told by the sales team that they offered discount rates for extended stays. She was surprised when they tried to continuously upsell her by offering various discounts on higher priced suite rooms, for up to half, the price *after* she had checked. This was totally misrepresentative of the facts she had been advised in email, that they offered no discounts on extended stays. Of course, Ms Nwosu relied upon the no-discount information she was given before she checked in and had already shortened her stays based on the information she was given (exhibit 8). These evident misrepresentations were fraudulent.

6.47.    This misrepresentation added with the drop in standards, lack of care for service quality, and prioritizing the bottom line, the disruption and inconvenience, overwhelmed Ms Nwosu to the point that she wouldn't stay at the Waldorf Astoria in DC again. Notably, the hotel manager, Mr Jamal Simington only half-heartedly attempted to reach out to her *after* she had checked out, and when she responded later, he never responded again.

6.48.    Notably, this drop in 5 star standards in DC was consistent with what Ms Nwosu had experienced on her vacation at the Rome Cavalieri – A Waldorf Astoria hotel in Rome in May, 2024.

6.49.    Just one year prior in May 2023, Ms Nwosu had a good stay at the hotel, prompting a return the following year but was dismayed by the poor service and drop in amenities.

6.50.    She was informed that the coffee machines in the hotel rooms were now reserved only for the 8th floor *Imperial rooms,* and had been removed from the other floors.

6.51.    She checked into a room that had severe plumbing issues such that the bidet, the shower and the toilet were not working properly.

6.52.    Eventually after waiting for over 6 hours, they were able to *finally switch her room.*

6.53.    However even the basic standards of the bed  preparation dropped – the bed had no duvet, and Ms Nwosu could not even sleep but was woken up repeatedly:



*Figure 6 substandard quality of bed at Waldorf Astoria Rome Cavaliari which the plaintiff had to sleep on and endure poor night's rest because of slow, poor resolution and negligent hotel standards*

6.54.   Rather than handling her complaints, like the Conrad the Rome Cavalieri Waldorf Astoria, kept silent, stalled. In fact one day Ms Nwosu got a bill envelope slipped under from the cashier stating she had unresolved charges, when in fact she did not because she had authorized her credit card to cover incidentals.

6.55.    Ms Nwosu also noted that the welcome gifts that were given to other guests, were not given to her. In fact when she spoke to the front office Manager about it, the manager lied that they don't have those type of gifts anymore, and when Ms Nwosu insisted she had seen it with her own eyes being given, the Manager conceded and mentioned she would send them up to her room.

6.56.    At Rome Cavalieri Waldorf, the misrepresentation was not just reserved to the rooms but also to the spa services. For example Ms Nwosu would book a deep tissue 80 minute massage, and be given a 50 minute Swedish massage, like she would not know the difference. And when she spoke with the spa staff about and asked to speak with the Spa Director, the front desk staff, said she would call the manager, yet instead called a therapist, presenting her to Ms Nwosu as though she was the manager.

6.57.   Eventually the same staff member called the manager/spa director, who was equally confounded as why his staff, understanding Ms Nwosu's request lied and presented someone to her that wasn't the director of spa services.

6.58.   Thus, Ms. Nwosu did not have much of a vacation as she was constantly battling to get the full amenities, and luxury standard that she had come to expect and what she paid for, throughout her stay and this cost her stress, loss of money because she did not get what she paid for. For example, Ms Nwosu, on instruction from the physiotherapist for a mandatory repeat session based on the injuries to the muscles in her body, had to stay another night, at her own expense because the spa staff, at her own discretion, elected to lie to Ms Nwosu and cut her sessions, and book her for the wrong types of therapies.

6.59.   The drop in service standards and misrepresentation, while raising prices, is not limited to the Hilton's luxury brands but also the Hilton hotels. According to the Hilton's SEC filing's description of the brand, "the Hilton hotels are our upscale, <u>full-service</u> hotels that typically include swimming pools, gift shops and retail facilities, meeting and banquet facilities, restaurants and lounges, room service, parking facilities and other service"

6.60.   In the plaintiff's experience this is a bold faced lie / misrepresentation, with the exception of Hilton's outside the USA, Hiltons' within the USA do not offer <u>full service.</u> In fact they don't even clean your room anymore – they offer "housekeeping" in theory whereby housekeepers push carts around like make – belief meanwhile they don't even clean the bathrooms. She noticed this omission in service in the downton Hilton in Denver in June 2024 and again in the Capital Hilton in July 2024.

6.61.   There is nowhere advertised on the booking website this removal, or scaled down version of cleaning service, which most people have come to expect in 3 star hotels.

6.62.   In fact, the plaintiff began staying at the Hilton because it advertised heavily its clean stay program post COVID, and had seen it implemented in their hotels in Quebec and Munich in 2023. See <u>Hilton Clean Stay</u>



*Figure 7* Hilton Clean Stay Advert, also publicized on television adverts

6.63.   She was surprised thus, when the housekeeper came to "clean" her hotel room in Denver 2024, and within 5 minutes she was done. The plaintiff noted the bathroom was left uncleaned, sheets unchanged, floors unvaccumed, and this was her third night in the hotel room. The housekeeper mentioned her instructions were just to spray some air freshener, take out the trash, replace the towels and straighen out the bed. Besides a bathroom cleaning solution, she had no other disinfectant for the

6.64.   In fact when she had checked in at night in June, she was surprised that as she laid down the bed was **wet.** Because there were no housekeepers and no similar suites available, she was just given a blanket to cover the wet bedsheet until the morning.

6.65.   On about June 26th 2023, after complaining to the operations manager on Ruben Membreno the operations manager said the Hilton stopped **its Clean Stay program silently, unbeknownst to Consumers.**

6.65.1. The plaintiff discovered in her stay in July 2024 at the Capital Hilton, that now, the Hilton **charges customers for cleanliness,** with its new program called <u>**Pure Rooms,**</u> advertising some hypoallergenic unprovable construct for additional charges.

6.65.1.1.   The Pure Rooms are sold to hotel chains like defendants 1 and 4 and proudly advertise up charging customers for cleanliness, as a means to gain "competitive advantage

6.65.1.2.   The Pure concept involves insider dealings as it is marketed by a former Marriott and Hilton manager, Haley Payne who is now selling cleanliness, under the guise of wellness, as an upsell marketing room category to the hotels of defendant 1 and 4 in the USA.



*Figure 8 Pure Room Wellness Ad seen in Capital Hilton on 1001 K Street, July 12 2024*



Figure 9 advert for pure wellness showing increased incremental revenue for hotels from pureroom.com

6.65.2. The Pure concept involves insider dealings/kickbacks as it is marketed by a former Marriott and Hilton manager, Haley Payne who is now selling cleanliness, under the guise of wellness, as an upsell marketing room category to the hotels of defendant 1 and 4 in the USA.

6.66.   Ms Nwosu knows firsthand the importance of having clean air in the room as part of all hotel room offerings, especially in hotel chains above three stars and describe themselves as upscale, full service or luxury or advertise publicly about the cleanliness of their stay.

6.67.   On February 6th 2024, in staying in a room with the 4th / 5th defendant in Tysons corner, her nose began to bleed because of the poor quality of the HVAC and at the lack of cleanliness of the air vent, which prompted an early check out

6.68.   In January 2024, when staying with the 4th /5th defendant in Ritz Georgetown location, the plaintiff was forced to also check out early because they could not fix

their HVAC system. During the night the plaintiff had began wheezing and had runny noses due to poor HVAC quality. The plaintiff avers she suffered personal respiratory injuries because of the poor air qualities in these locations.

6.69.   The defendant 6 apologized and said the vents will be cleaned and the smell of the HVAC fixed for her next stay, however this was not the case. Upon returning to the 4/5th defendant in Ritz Tysons Corner - Virginia, this July 2024, she checked into room 1411, an executive suite and the HVAC odor was still present. Ms Nwosu then asked for a humidifier which did not help, and eventually a staff offered to transfer her to another suite, suite 1511, which did not have the smell. Not only were these problems not fixed, as defendant 6 had promised, but was still causing the same inconveniences like last time more than 6 months later. Thus , the luxury standards defendant 4/5  were advertising were simply not luxury at all. They simply misled the plaintiff by lying to her that they intended to fix problems with their hotel, which they had not intention of fixing, yet the plaintiff relied upon such information and promises of improvement, returned and paid money to that effect to stay in the hotel based on false promises of the defendants 1,2,3,4,5,6.



*Figure 10 dirty air vents from defendant 5, Tysons corner, emailed to Roman Dauze, General Manager on February 6*

*Figure 11 Blood from the nose of Ms Nwosu taken as a result of poor HVAC and air quality in the suite in defendant 5, Tysons corner*

6.70.   In June 2023, while on her business tour in Europe, Ms Nwosu's gold bracelet was stolen from a hotel room in Defendant 1 at the Hilton Munich City located at Rosenheimer Str. 15, 81667 München, Germany, for which she had stay back extra

28

days in Munich to file a police report (exhibit 4), speak with the police and the defective and miss a court case in the USA. This missing of that trial date has in part cost her in excess of $400,000.00.

6.71.    The Hilton staff were slow to respond to the incident, repeatedly questioning Ms Nwosu on whether she had indeed left the item in the hotel. It was when the bracelet was not on as she checked out, but was on the previous night when she returned from Stuttgart, after a meeting with Mercedes Benz, that they began to take her claim seriously, and testified that only she and the housekeeper had been into the room. Prior to that they had vouched for the housekeeper, holding him out to be their employee of 7 years to Ms Nwosu. Ms Nwosu had to extend her stay for at least 2 extra days to comply with investigations to try to retrieve her newly bought 18 karat gold Firenze cut bracelet. **She paid for these stays,** the Hilton did not even as much offer nights off, for her losses. It was after she extended the stay, and noticed disgusting cleaning housekeeping standards, including using water from the toilet bowl and toilet brush to clean the seats of the toilet, and using guests face towels to wipe the floor that she noted the housekeepers were not even Hilton employees.

6.72.    Thus, the Hilton general manager, front desk staff, and operations manager, all stalled in calling the police, reviewing the cameras, for over 2 days after the incident, because they were **negligently vouching for a person who was not even their employee, all the while misrepresenting to Ms Nwosu as though he was,** for the sake of dissuading her from believing she had lost the bracelet on site.

6.73.    Ms Nwosu never retrieved her lost bracelet until this date or corollary expenses

6.74.    She returned to the US in June 2024, and immediately had to begin taking care of business. At her stay at the Waldorf Astoria, she happened upon the Hilton corporate management conference, and obtained the contact of the head of security after recounting both the housekeeping lapses, and negligent violation of inn keeper common laws that resulted in her losses of her bracelet and corollary expenses.

6.75.    John, the head of security took heed to her feedback to her housekeeping and Ms Nwosu noted that they intended to improve their standards. He also redirected her to Hilton's internal insurance, Chubb, for Europe. Unfortunately, because the price of gold fluctuates as a commodity, Ms Nwosu could only provide the market value price of the bracelet, and as the seller of the bracelet noted to her on email, the

bracelet was no longer available and would not be remade by the goldsmith until further notice. Thus, Ms Nwosu could not recoup the cost of her lost bracelet.

6.76.  Ms Nwosu's contracts with the Hilton during the time of theft is sufficient to satisfy inn keeper common laws, whereby the hotel owes a special duty to guests in their hotel under common law doctrines of inn keeper laws, *Novak v. Cap. Mgmt. and Dev. Corp.*, 452 F.3d 902, 911 (D.C. Cir. 2006). This prerequisite of duty is one of the fulfilled elements of the claims, which the plaintiff pleads for the tort of negligence on the part of defendant 1.

6.76.1. Additionally, on July 16 2024, the Capital Hilton committed fraud for when Ms Nwosu asked before checking in and paying for a room, whether they cleaned the bathrooms daily in this property, the front desk staff assured Ms Nwosu, Yes they cleaned bathrooms daily. She sought clarification after her harrowing and misrepresented experience in Denver 2024 when she found out the Hilton's daily cleaning services were skeletal and pretentious at best.

6.77.  In fact the Capital Hilton was so filthy, that Ms Nwosu saw at least three well fed jumbo size rats this July 2024 on the property line, and in the garden of their Capital Hilton, and when she reported it to the front desk staff, they simply said the rats are outside, i.e. The staff knew fully well they had a rodent infestation on their property, but were unbothered, did not advice guests of the rodents infestation though the only thing blocking the rats from entering inside was an automatic sliding door.

6.77.1. Ms Nwosu not only holds that the hotel committed fraud but in fact was **unjustly enriched** because although Ms Nwosu checked out early after seeing the rats repeatedly and witnessing the skeletal housekeeping services, they refused to provide her with a refund on her unused night, though she asked for it.

6.77.2. As aforementioned, the promises of improving the housekeeping services were false, defendant 1 evidently cut housekeeping budgets worldwide, and scaled down cleaning services. For example, instead of changing sheets every other day, the Hilton now changes sheets on the 5th night / 6th day, as told by Ruben the operations manager at Denver and as outlined by the plaintiff, it does not even clean the bathrooms, while advertising as a full service upper upscale nonetheless. These instructions are coming from the same corporate office in Virginia, some of the staff whom Ms Nwosu met in June 2023, and **pretended to take her feedback.** Apparently, this bewildering experience is not limited to Ms Nwosu's experience

alone. See below similar experience of the hotel's negligence and **gross negligence in upholding advertised standards.**



Figure 12 SImilar experiences of deceptive skeletal housekeeping practices being noted by other Hilton staff

6.77.2.1.   For advertising as full service, the Hilton Downtown Denver and the Capitol Hilton Washington DC did not even the basic amenities such as ear bud cleaners, which they say guests can request if needed. They did not even have the note pads and Ms Nwosu was given this random book as a concession when she asked for a Hilton writing pad in Hilton Denver , and this is supposed to be a full service hotel catering to business travelers who would need such.  Ms Nwosu returned the book, and the operations manager sympathized with her frustration of the corporate's penurious slashing of budgets at the expense of

guests, under false pretenses, and escalated her complaint to Hilton corporate - who did nothing.

Figure 13 concessionary notepad given to Ms Nwosu in Hilton Denver because of lack of amenities.



6.78.    None of these "scaled down" skeletal services are advertised anywhere in the Hilton's policy. The plaintiff holds that her claims satisfy not just fraud but also the violation of the DC and Virginia Consumer protection acts. The Denver City Hotel goes a step further claiming it has a business center though there is none. What they have is a UPS store, a completely separate business entity for which the guests must pay separately. Ms Nwosu relied on this misrepresentation/omission in services, and chose the Hilton when booking, in part because of its advertised business service center. Ms Nwosu incurred unforeseen costs and expenses as a result.

6.79.    Not only are the aforementioned acts fraudulent and in violation of the Virginia Consumer Protection Act, but they are also in violation of the DC  Consumer Protection Acts code 28-3904 Unfair or deceptive trade practices, whereby it shall be a violation of this chapter for any person to engage in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby, including to:

6.79.1. **(a)** represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have; in this case with regards to 5 star standards, cleanliness, having full service ammenities, providing housekeeping, and **(d)** represent that

goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another; **(f)** fail to state a material fact if such failure tends to mislead;

6.79.2. **(f-1)** use innuendo or ambiguity as to a material fact, which has a tendency to mislead; **(h)** advertise or offer goods or services without the intent to sell them or without the intent to sell them as advertised or offered;

6.79.2.1.   In fact, the Waldorf Astoria which is historiccaly known to be a 5 star brand, could not even make 5 star status when the Hilton took over the former Trump Hotel, and converted it to a Waldorf Astoria. It was rated a 4 star hotel.

*Figure 14 Series of screenshots showing that on the Hilton website there is no mention of scaled down housekeepng services between luxury and upper scale and mid scale hotels listed, there is distinction or enumeration. This ommision is fraudulent as it leaves guests perplexed and surprised.*



*Figure 15 Denver city hotel advertising they have a business center when in fact they do not have that ammenity for guests to avail of freely as is expected. They fradulently advertise UPS services as theirs*



34





Figure 16 embassy suites is a lower category tier than waldorf astoria yet the policy on housekeeping is unclear

Figure 17 Waldorf astoria and embassy suites have similar advertised services without any clarity of variation in housekeeping services

7. With regards to the counts in clause 5.7 **Fraud (Ponzi Schemes) and Breach of Implied & Express warranty (Breach of Contract) & Deceptive Pricing Practices (Unfair and Deceptive Trade Practices), Negligence,** Ms Nwosu confirmed about the ponzi scheme being run by the corporate head offices of defendants 1 and 4.

7.1. When she checked into the Hilton Denver around June 23 2024, she sought to book a suite and asked the front desk staff, *Troy,* which category below she had to book in order to qualify for the upgrade, as per the rules of the Hilton Honors rewards program

7.2. After telling her the category she had to book, he then created a lie, unbeknownst to the plaintiff at the time, that he could not book the category below because the system would not let him, and she had to pay for higher category the room directly

7.3. Tired, Ms Nwosu conceded though she though it was odd. After taking care of her business, she followed up with an assistant front desk manager about the encounter, and the assistant front desk manager, Reine, affirmed her suspicion that Troy had indeed lied to her, to get her to pay more and **deny her the benefits she was entitled to, under the warranties / contracts created by the rewards programs.** Ms Nwosu suffered loss, inconvencience, charges distractions as a result of these illegal acts by the defendants

7.4. Similarly, defendant 5 – 8 breached their warranty programs when Ms Nwosu paid with her points, and yet they asked her to pay an $1000.00 for an upgrade to a suite this July 1st 2024.

7.5. Ms Nwosu had initially conceded but later upon checking out she reviewed the terms and conditions of the loyalty program for Marriott Bonvoy and she found that there were no exclusions barring upgrades with points as the general manager Roman Dauze had presented to her (exhibit 5).

7.6. In fact, Roman had enganged in bait & switch pricing, when Ms Nwosu advised she needed to extend her stay and asked since she would staying for more than 14 days for a fair rate. Roman said he understood, then asked her to book to reserve the room, and he would see what he could do with rates to avail her of a discount. Ms Nwosu pushed back, and said that he should let her know first so she can make a decision given the cancellation fees. But Roman insisted she book first, and she should not worry Thus, it was her understanding, and based on the practice of the defendant 4, given long stay discounts, beyond the listed prices, that she conceded.

7.7.   After booking and obtaining a confirmation number, Roman switched on her. He told her she had booked the best available rate and then tried to get her to stay to the end of the week, to see what he can do and "Discuss with his team" citing it was out of his hands, *all after she had extended a stay and obtained a confirmation number.* He did not mention any of this prior, and Ms Nwosu has this all on text.

7.8.   Ms Nwosu also recounted this deceptive practice by the Ritz Carlton Georgetown in June 2024, when the front desk manager,

7.9.    Poplin lied to her that there were not suites available for her intended dates, wherein fact they were and the general manager upgraded Ms Nwosu.

7.9.1.   Emma's lies had been so malicious because she knew Ms Nwosu needed space and Ms Nwosu had advised if the suite was not available she would not extend her stay. So when she advised Ms Nwosu that there was no suites and Ms Nwosu mentioned she would checkout, Emma replied "Perfect." Meaning that she intended fully to deprive Ms Nwosu of a stay that was available and deny her the privileges to which she was entitled.

7.9.2.   Ms Nwosu on second thought, before checking out, thought to check with the general manager on the availability of the suites because already, she had been lied to by front desk staff that the Ritz brand does not do upgrades, which she knew for fact was untrue, because she'd been upgraded at Ritz Carltons prior.

7.9.3.   Sadly this was not the first time Ms Nwosu had to experience humiliation at a Ritz. In Tysons corner, Ms Nwosu returned from an outing only to be told that she had been downgraded, and was locked out of her room. She was informed by the front desk staff that the upgrade had only been for one night, not the entire stay – contrary to the Gold Elite Terms and Conditions which advertised it was for the entire stay. Ms Nwosu had to suffer, tired, arguing before the front desk manager came out and apologized for the "inconvenience." Parker, the then valet staff, mentioned he had <u>never</u> seen that happen to any guest, further alluding to defendant's 4 negligent and discriminatory practices in seeking to extort unjustifiably Ms Nwosu and deprive her of her benefits.

7.9.4.   At no point in time did Emma or Rishi mention the Ritz $2000, which the Ritz Carlton brand is historically known for: allowing for a budget of $2000 to cater to the unique needs of their guests and keep them loyal

7.9.5.  At no point in time did these staff from defendant 4 mention the $200.00 Ms Nwosu would have been entitled to, as part of her gold Elite Member status, should she not be able to avail of the benefits of her gold elite status (see exhibit 5).

7.9.6.  Emma also refused to change Ms Nwosu's welcome gift when Ms Nwosu mentioned she had allergies to certain fruit, thought the hotel could readily provide alternatives. Ms Nwosu asked Emma publicly in the front lobby at least twice, and knew for certain other gifts like wine/chocolate/cheeses could have been provided. Emma just sought to deny Ms Nwosu service.

7.10.  It is defendant's 4 and 5's practice to minimize expenses, even in luxury and find ways to defraud guests, and maximize profits.

7.11.  For example, the managers purport that the rate jukes are due to demand alone when the rooms are fully booked, but unkionwn to guests, the Ritz Tysons give staff guest accommodation from available inventory, and this too uses up their inventory and contributes to a sold out hotel and rate hikes on unsuspecting guests. Ms Nwosu saw Sera, the concierge and Madison, a front desk staff check into rooms during her stay.

7.12.  In Barcelona Hilton Diagonal Mar, the front desk manager denied Ms Nwosu her upgrade, Meche Aragones, and even went further to profile her stating it was weird that she arrived at the night without a reservation

7.12.1. Ms Nwosu explained that her flight took off in the evening and she does not reserve in advance due to stringent cancellation polices, and especially in new hotels she has not stayed in before she wasn't to ensure the standard

7.12.2. Ms Nwosu ended up checking out early because of the racial profiling and also because the HVAC in her suite was not working, and there were bugs coming out of the worn bathtub in the suite she paid for.

7.12.3. Ms Nwosu paid over $700 for the highest suite after being denied her upgrade, though receiving a welcome letter that did not say anything about such exclusions of room categories. In this case the higher category room was available so Ms. Nwosu should not have been denied her upgrade. See below, figure 18:

Figure 18 actual copy of welcome letter showing benefits with no mention of exclusions on room categories from Hilton Diagonal Barcelona, Spain in May 2024



Hilton HONORS

We are happy to welcome you to our hotel as a **Diamond Member**!

On behalf of the entire team, we would like to thank you for choosing Hilton Diagonal Mar Barcelona as your place to stay in the city. As a Diamond Member, you are among our most valued guests.

As a **Diamond Member**, we are happy to offer you

**Complimentary Breakfast** served on the 1st floor
**Monday to Friday** 07.00 am - 10.30 am
**Weekend and Bank Holidays** 07.00 am - 11.00 am

**Executive Lounge Access** located on the 15th floor
**Opening hours** Daily from 07.00 am – 8-00 pm
**Alcoholic Beverages and Canapés** are served daily from 5.00 pm until 7.00 pm

**Space Available Room Upgrades**
The hotel is happy to upgrade you to a higher category room. Subject to hotel availability

**Free Premium Wi-Fi**
Use our Premium Wi-Fi by inserting the code Hilton05

Enhance your stay as a **Diamond Member**

Choose Your Room
Digital Check-in
Unlock Your Door with Your Phone
48-Hour Room Guarantee
Points Towards Free Nights

**Room Service and Guest Services**
Room service is available from 07.00 am until 01.30 am every day. Order via the QR or by calling 52.
Housekeeping amenities upon request from 07.30 am to 9.30 pm. Order via the QR or by calling 7030.
For further assistance calling 9.

**Restaurants**
**MA'I Bar & Restaurant** located in the lobby, opened daily from 08.30 am – 01.00 am
**Michelin Star Restaurant AURT** open from Wednesday to Saturday. For reservations please contact email to reservas@aurtrestaurant.com

**Purobeach Swimming Pool**
- Pool: 10h-20h
- Bar: 10h-19h30
- Kitchen: 12h-18h30

**Fitness Center**
Our gym is located on the 2nd floor and open 24/7

Sandra Lasso – Front of House Manager – sandra.lasso@hilton.com

paco.guardia@hilton.com

Hilton

Please let me know if I can be of further

My name is:

MERCHE ARAGON

7.13. Similarly on July 3rd 2024, Ms Nwosu noted that at the Waldorf Astoria, in Washington D.C , David Morrison, a new front desk manager from the Hilton Midtown, came implement their duplicitous practices in the DC luxury brand.

7.13.1.1.  Specifically, Mr Da'Ron Crosby checked Ms Nwosu in, and noted on her profile that she preferred 721, and whenever she came she was upgraded to that room as per her complimentary upgrade Diamond member benefits.

7.13.1.2.  David Morrison, the new front desk Manager in 2024 tirelessly worked, and would send Mr Da'Ron Crosby, his junior to Ms Nwosu's table even whilst she was having breakfast, to try and downgrade her room under the guise of it having a cleaner amenities, rather than fix the defunct amenities in her room, just so they could sell the higher category room immediately, despite its defects. Ms Nwosu knew this because she had specifically told Mr Morrison to work to fix the bath tub, carpet stains asap and did not want to be inconvenienced with switching rooms.

7.13.1.3.  Mr Morrison had also tried to offer Ms Nwosu 40,000 points and she refused, and specifically stated this was not one of the times she would tolerate going to a higher category room as a patchy resolve; she insisted they simply needed to sell what they advertised and fix the problems.

7.13.2.  Similarly, the Rome Cavalieri front desk manager, Nicholas, told Ms Nwosu he spent the past 4 hours assigning room bookings, when Ms Nwosu visited the hotel in May 2024

7.13.2.1.  He had wanted Ms Nwosu to stay in a faulty room with faulty bathroom than reassign her room.

7.13.2.2.  Ms Nwosu could not enjoy her holiday or night's stay after hearing Mr Nichols lies trying to convince her that her room was upgraded because it was a higher floor, despite there being no such category type. He, like Mr Morrison, and Chris Song, did everything possible, including wear Ms Nwosu out trying deceive her and deny her Hilton diamond honor benefits, which she availed of last year, twice when she visited the Astoria. Mr Nichols even tried to stop her from escalating her complaint. Like the 2nd and 9th defendants, Ms Nwosu never met Mr Nicholas last year when she stayed at the Waldorf Rome Cavalieri and must be part of the Hilton's mission to deceive consumers, limit their ability to avail of its advertised benefits, breach their implied and expressed warrant contracts, and reward their managers for sales revenues

7.13.2.3.  Ms Nwosu noted that at the Rome Cavalieri, would note their preferences on their bookings were waiting long hours to check in as they would first be given a room that was not noted in their preference and then have to insist, wait and

essentially fight for the room they want to have it given. For example, a guest had wanted a room on the Imperial floor, and noted that on his booking with two daughters. Ms Nwosu who had asked for that room was told it was not available. Eventually she watched the guest wait and fight for that room, and then it became available.

7.14. Ms Nwosu suffers from psychological injuries that manifest physically as upper back/shoulder muscle fatigue/aches/injury. Such injuries to her body result from of undue stress such as in the case of having to confront these duplicitous managers. On all occasions, she had to expend more money booking extra physiotherapy sessions as a consequence of dealing with unexpected stress of these lying managers and fraudulent practices of the defendants to breach their express and implied warranties.

## 8.  <u>Further Breaches of Express & Implied Warranties through Deceptive Trade Practices and Fraud</u>

8.1.    In the past year, Ms Nwosu has noted an increase in room categories, in order to diminish the value of the rewards program and make it harder to avail of room category upgrades

8.1.1.  For example, once checking into the Waldorf around January 17 2024, she was initially given an accessible room as an upgrade, because it had a bigger square footage, and because it was on a <u>higher floor</u>, though it was the same type of room.

8.1.2.  Then, the higher category up, was a <u>grand</u> room, and Ms Nwosu argued that a higher floor was simply a "preference," not a different room category type; and that a slightly bigger room with the same layout and amenities, was effectively the same category type.

8.1.3.  Eventually, she was upgraded to an actually different category room with a different layout, but not after she insisted.

8.1.4.  Later, When Ms Nwosu tried to book at the Conrad, Ms Nwosu noted, that a <u>higher floor preference,</u> was listed as a separate room category type, that one could be upgraded to. This is simply an unfair practice, because a higher floor has nothing to do with the actual room size and layout. In fact, sometimes, Ms Nwosu prefers lower floors when traveling with her dog because it is easier to get out, but because of all the changes, a higher floor, instead of an actual room category

9.  **Altering Room Categories in Order to Diminish/Dilute the Value of their Express and Implicit Warranties in the Points/Loyalty System**

9.1.    The points are not a commodity that is traded, in fact when the prices of rooms swing sporadically, the points needed to "purchase" that room remains the same.

9.2.    What this shows is that the inherent <u>value of the room</u> has not changed, and in fact cannot, in the space of a day.

9.3.    Essentially, incumbents are being punished/gouged at / taken advantage of unfairly and unjustifiably because of transient demand, and then subsides.

9.4.    By classification, these hotel rooms are time-shares, not tradable commodities and it is illegal to treat them as otherwise, otherwise they should be regulated by the SEC etc.

9.5.    Last year, when Ms Nwosu booked the Rome Cavalieri, a Waldorf Astoria hotel, there were not as many categories as there are now. The Rome Cavalieri hotel is an eight floor rectangular hotel with 2 primary views – the view overlooking the Roman city, and the view overlooking the street.

9.6.    ALL the rooms, with the exception of a few suites, have the same size and layout; it's a very basic hotel, in terms of architecture. Yet, from this layout, the Hilton is able to change the software to create multiple room categories, including a "private park view." This upsell in room categories is pure deception Rome Cavalieri has NO PRIVATE PARK! They even try to split the pool and park view into a category that one should pay for, whereas one can see both the pool and the park in one view – see figure 20.

9.7.    To Mr Nicholas' lies which Ms Nwosu exhaustingly refuted, there is no distinction in the floors, with the exception of the Imperial floor, i.e. the 8th floor– which too should not be something anyone has to pay extra for, because it has rooms of the same layout. It probably should just be assigned to people who book early for it and request it, not selling it as a different room category

9.8.    The Hilton has fewer properties globally with an executive lounge for Diamond member, for which they grew in popularity. For example in the Conrad, Ms Nwosu had to pay $300 extra to access the new "Sakura" lounge; the Cavalieri, similarly the Rome Cavalieri the Cavalieri lounge one has to pay extra.

*Figure 19 ridiculous hair splitting of room categories when in fact most the rooms are the same size and most have the same view*



*Figure 20 Photo of the "Rome View" taken in 2023 by Ms Nwosu - there is no private park, you can see the pool and the park from any balcony on this side of the hotel*



9.9.  At the Waldorf Astoria, DC, when they couldn't change the layout of the rooms, they behan changing the names of the rooms and demanding higher prices for a name change, without change to the substantive unit itself. For example, what previously was a grand room, is one a one bedroom suite, at double the price, which may be offered at a "deeply discounted" rate of half the price – i.e. the real price. This fraudulent pricing is in violation of both DC Consumer Protection and Virginia protection laws, and is fraudulent misrepresentation. See Exhibit 7.

9.10.  This restrictions on warranties by restricting the booking with points and randomly changing opportunities to avail of points booking is also wielded more sporadically by the 4th and 5th defendants, though not by creating frivolous room categories.

9.11.  The 5th defendant instead just restricts properties on which can book with points and the customers do not know which property, or when. It is completely random. This is an unfair practice because it lacks transparency yet influences the customer's decision to join their loyalty program. For example, had the Marriott advertised that their points can only be redeemed on **four out of their twenty plus brands**, Ms nwosu would not have signed up for their rewards. However, they keep their ads vague, intention is irrelevant. The material fact is she fully relied on the facts they mentioned in their program to have a reasonable expectation and inference that if they omitted to exclude that the points were not redeemable whenever she would like, or at a huge number of their brands, that would not be the case. Whereas the reverse is true.

45

9.12.   Additionally, the 5th defendant is totally incongruent in an untransparent manner with its offerings. For example, on one 7 day stay it will offer breakfast credit and count it as a long stay. Yet on another 7 day stay in the same hotel, this rate will not be available.

9.13.   This incongruency in its advertised value and sales offering that is based on sheer randomness only creates a loophole to extort guests, charge them unfairly as they please and empower their managers to have a fall-back excuse for earning more commissions. The question remains, what is the true value of the time share room, food and beverages you are offering guests.

9.14.   In fact defendant 6 and 8 weaponized the randomness and alleged obscurity of the pricing system to extort money from Ms Nwosu, withholding benefits that they know they ought to give based on historic practices, and her as a repeat corporate client.

9.14.1. For example both defendant 6 and 8 lied that they cannot offer discounts on long term rates, and defendant 6 went so far to bait & switch on Ms Nwosu after having her book a room, extend her stay on the pretense that he would apply a discount based on her extension. After she extended her stay, Roman boldly lied to Ms Nwosu stating it was out of his power, as a general manager, and had to go with what the system showed him

9.14.2. This is untrue as Ms Nwosu's with managers in the Ritz in Montreal, sua ponte offered Ms Nwosu a discount on her extended stay, and they book with the same system.

9.14.3. Similarly defendant 8 had lied to Ms Nwosu that there were discountable long term rates available, meanwhile Axel, his front desk staff had mentioned they had an in house guest who had booked an extended stay in one of the suites, and renewed it as needed. When Ms Nwosu asked for a similar option, defendant 8, steered her away discriminatorily towards the Rosewood Hotel, and said Axel had misspoken about the other long term guest that there was no such arrangement.

9.14.4. This price discrimination against Ms. Nwosu is unfair, as a self-employed business woman who repeatedly brings the suites business, she would be entitled to the same discounted rate as corporate clients, who do the same thing she does: repeatedly bring the hotels business through their stays. Somehow, these managers just saw Ms Nwosu as a cash-cow to exploit, similar to how women's self-care products like

shaving sticks became more expensive than men's in the famous adage: pink it and shrink it.

9.14.5. Notably, as the court upheld in 2020 in Fessler vs IBM in the Appellate Court for the 4th circuit, the lack of intention of the other party's obligation to fulfil a claim does not matter for the claimant, i.e. the expectation of the failed party to fulfill or not fulfill the obligation does not matter; what matters to successfully plead the claim is that the claimant had expectations, based on the actions of the defendant, that were eventually unmet . That the defendant reserved rights to modify their terms too is not a valid excuse to dismiss a claim of constructive and actual fraud; provided that up until the time of the actions, the claimant had a reasonable expectation based on their understanding of the terms as at the present moment. The defendant's rights to change terms does not preclude claims by a claimant in a breach of contract and fraud tort. Fessler v. IBM Corp., No. 18-2497 (4th Cir. 2020)

## 10. Counts of Anti Trust Violations – Sherman 1,2, Clayton Act and the Robinson Patman Act

10.1. In **Brown Shoe Co. v. U.S., 370 U.S. 294 (1962),** the Supreme Court opined "it has long been clear that a pattern of acquisitions may itself create a combination illegal under § 1, especially when an original anticompetitive purpose is evident from the affiliated corporations' subsequent conduct. The Yellow Cab passage is most fairly read in light of this settled rule. In Yellow Cab, the affiliation of the defendants was irrelevant because the original acquisitions were themselves illegal. An affiliation "flowing from an illegal conspiracy" would not avert sanctions. Common ownership and control were irrelevant because restraint of trade was "the primary object of the combination." The Government brought suit to enjoin consummation of a merger of two corporations, on the ground that its effect might be sb- stantially to lessen competition or to tend to create a monopoly in the production, distribution and sale of shoes, in violation of § 7 of the Clayton Act, as amended in 1950. The District Court found that the merger would increase concentration in the shoe industrv, both in manufacturing and retailing, eliminate one of the cor- porations as a substantial competitor in the retail field, and establish a manufacturer-retailer relationship which vould deprive all but the top firms in the industry of a fair opportunity to compete, and that, therefore, it probably would result in a further :ubstantial lessening of competition and an increased tendency toward monopoly.

In this case, the court stopped acquisitions and expansions by [enjoinig] the appellant from having or acquiring any further interest in the business, stock, or assets of the other corporation, required full divestiture by appellant of the other corporation's stock and assets, and ordered appellant to propose in the immediate future a plan for carrying into effect the Court's order of divestiture.

10.2. Likewise, the plaintiff in this case pleads that defendants 1 and 4 use their economic scales from acquisition to stifle competition and choices for consumers in the market. Specifically, their growth and pattern of acquisition strategies of luxury, upscale, midscale hotels, is such that it ends up dominating all three market tiers. Furthermore, this is problematic and lends to the violations of the Robinson Patman Act because of their use of artificial intelligence to dynamically raise prices across all hotel tiers simultaneously, at the same day and time, using a single computerized booking system. Since there are far more Marriotts and Hiltons than other boutique hotel chains in cities like downtown DC, once those sell out, customers are <u>forced</u> to comply with the artificially inflated prices of defendant 1 and 4 across all hotel lines.

10.2.1. This is a modern spin on the traditional price fixing, now using artificial intelligence, and it is illegal. An oral, written argument is not necessary between defendant 1 and 4, however since both can use their AI powered booking system to mirror the prices of each other based on demand, price fixing is inferred, and is sufficient for defendant 1 and 4 to violate The Sherman Act, via control of prices, whether intentional or not:

10.2.1.1. "The <u>Sherman   Act</u> § 1   condemns   any <u>contracts,</u>   combinations, and <u>conspiracies</u> in restraint of trade, which includes vertical and horizontal price-fixing schemes. Horizontal price fixing agreements are the stereotypical example of price fixing which involves competitors that agree to raise, lower or stabilize prices, creating a <u>cartel</u> agreement. For example, when two competing fast-food chains that sell hamburgers agree on the retail price of cheeseburgers, that horizontal agreement is illegal under the Sherman Act because it would undermine market pricing. Price fixing does not require an explicitly set price but can be achieved by agreeing on an algorithm or other method for controlling prices."

10.2.1.2. <u>Illegal price fixing can occur where the parties have not directly communicated with one another.</u> The Sherman Act § 1 covers "contracts," "combinations," or "conspiracies" formed in order to restrain trade which can occur without formal communication. For example in *<u>Interstate Circuit v. United States</u>*, the Supreme Court found a conspiracy to exist among the distributors of films in Texas, even though no evidence existed of communication among themselves, because each changed their prices after receiving the <u>same demands</u> from two primary movie theater companies in the state.

10.2.2. Defendants 1 and 4 use the same online booking system globally for their respective brands, it blurs the lines problematically between luxury and alleged midscale brands, whose tiers were traditionally separated by price.

10.2.2.1. For example an embassy suite can go for the same price as a Waldorf Astoria, for insufficiently justified reasons such as increased demand. This happened to the plaintiff on April 18th 2024 when there was high demand:

10.2.2.2. In the District of Columbia, the same room in the ritz went from $1300, to $3000, then $10,000 within the space of one night. On that same night the Embassy suites climbed up from $200 to $700+ and even when she enquired to stay in these rooms they ended up not being available. Meanwhile in periods of low demand, a room in the Waldorf Astoria DC sells for $400

10.3. Such unfair dynamic price changes and flattening among brand tiers misleads and confuses expectations of services among guests because the advertised services across brand tiers do not change at all on the websites – so for example it is unclear if housekeeping is once a week, three times a week or daily,

10.3.1. Additionally, in the airline industry business class is usually at least twice the price of the economy class, allowing for a clear distinction in value; and clearly business class has more amenities, exclusiveness, completely different comfort levels and service. Furthermore, when prices go up, they go up in a predictable pattern, usually trending up in ticket prices as the cheaper early bird tickets have been sold.

10.3.2. **Notably,** because flight tickets are not a commodity or security that can be traded or transferred, the prices once they go up, <u>typically do not go down, unlike the hotel industry</u>

10.3.3. The airline industry which is better regulated also offers customers transparent pricing such that it gives customers the option to to book airfares that are **not** subject to rebooking fees or fare differences should their plans have to change in the future.

Thus, customers can transparently hedge against sporadic rate hikes by paying more early on, to avoid change fees or fare differences should something happen and they need to amend their dates.

10.3.4. This is in contrast to an industry with the pricing of defendant 1 and 4 that involves sporadic upwards fluctuations in that blur the value distinction between lower tier hotels and luxury hotels, even though the amenities, value delivered are readily diminishing



Figure 21 example   price flattening across luxury and miscale brands caused by dynamic pricing used by 1st and 4th defendants – the hampton Inn, a midscale brand normally in the $100/$200 range can go for upwards of $360 and compete with the St. Regis, a luxury brand.

Figure 22 Within the Hilton the Conrad a luxury brand is only $77 dollars more than a Hampton Inn which is at least 8 tiers below the Conrad, according to the Hilton portfolio

**11. Gross Negligence, Willful and Wanton Negligence on the Part of Defendant 1 and Defendant 2**

11.1. The plaintiff insists that defendant 1 has been grossly negligent in hiring incompetent staff who do not understand luxury consumerism and luxury to run luxury hotels. The closing of multiple luxury locations, aside from Ms Nwosu's personal experiences of substandard services is self-evident; including defendant 9 who came from a non-luxury hotel to a luxury hotel

11.2. That grossly defendant 1 was negligent to re-hire defendant 2 and 3 to the Conrad Washington, DC, after the Conrad hotel had closed down in New York, Mid-Town, and they were part of the failure. That it was grossly negligent, if not wantonly negligent of defendant 1 to let the Conrad run without an operations manager or general manager, for any time period, while charging guests full, inflated and exorbitant rates.

11.3. The plaintiff insists that defendant 1 is grossly and wantonly negligent to not establish an active and competent customer service desk, and that when Ms Nwosu called to escalate her complaints, the customer service desk did absolutely nothing, and that filing an official complaint on the website went back to the very hotel she was complaining about.

11.4. The plaintiff avers defendant 1 was grossly negligent and wantonly negligent in receiving her feedback of poor housekeeping and safety services in their hotel, yet scaling down housekeeping services across their Hilton brands, without advertising and unbeknownst to guests

11.5. The plaintiff avers defendant 1 is wantonly negligent to be receiving feedback from their consumers, managers and yet continue to recklessly expand, placing profits above people.

11.6. The plaintiff avers defendant 1 is grossly and wantonly negligent to not ensure that their properties are pest and rodent free, and instead seek to pacify consumers by callously offering points for substandard hotel rooms, services and cleanliness standard

11.7. The plaintiff avers defendant 1,4 and 5, are negligent in failing to ensure that their staff are well educated to treat all guests equitably irrespective of race.

11.7.1. For example, during her stay at the Conrad Algarve in Portugal this May, Ms Nwosu encountered a hostile front desk staff, Natasha, who voiced her prejudice against

her for being a walk in and only first booking one night. Natasha called her the next day well before check out at noon, just to remind her to check out. Sadly for Natasha, Ms Nwosu elected to extend her stay for seven more days, having found at first blush, the hotel to be tolerable, and would be initially willing to spend her money.

11.7.2. Similarly, Ms Nwosu endured prejudice by the staff of Barcelona Hilton Diagonale, when Meche Aragonés profiled her as suspicious because she checked in at night. It's so stupid that the Hilton an international brand would not be cognizant of the local stereotypes by less educated Europeans who do not know that Black people can actually be wealthy, and *travel,* as they wish, and not have consciously sought to screen against such stereotypes, in their hiring.

11.8. In all these claims the plaintiff has suffered harm, by way of monetary loss in paying for services she did not receive and/or was not as described, injured bodily as a result of stress, suffered losses from having to repeatedly move due to lapses in service quality and availability, stress in availing of benefits, repeatedly, book physiotherapy treatments from unwarranted stress.

## 12. Reliefs

Ms Nwosu cannot catch a break, whether trying to take a vacation or rent a room in a hotel for 6 weeks so she can focus on her work; these brands have made it practically impossible to plan, and to have a reasonable  expectation for the service standards they advertise, especially for so called luxury. The incentivize and empower staff to effectively defraud and deprive guests of the explicit and implicit warranties they advertise, condone and become indifferent to poor standards, all the while ever increasing and ripping guests off. All defendants do this in instances of reckless disregard of prior settlements where they have been forced to pay out millions of dollars in claims to customers. Apparently, $5 million is not deterrent enough for illegal practices.

12.1. Wherefore, for all the inconveniences suffered, monies lost, and breaches in service standards, the plaintiff seeks in excess of $600 million dollars  in compensatory and punitive treble damages from the defendants ,

12.2. She also seeks injunctive relief of $100,000.00 to recover her assets lost during the lapses of service standards, false advertisements, inter alia.

Respectfully Submitted,

Adaeze Nwosu

Plaintiff

22 July 2024

Exhibit List

Exhibit 1 – 2nd booking confirmation, for Conrad DC with Points redemption, early checkout for Conrad DC, silence by Conrad Team after failed services

Exhibit 2 – email showing duplicative debits on plaintiff's account meanwhile conrad invoice showing daily charges for pet and deposit were already taken

Exhibit 3 – Hilton police report Munich following theft of Ms Nwosu's gold jewelry

Exhibit 4 – T&C gold elie status

Exhibit 5 – See list of Marriott and Alexandria chains

Exhibit 6– Capital Hilton, Rodent infestation echange, no refund even on forfeited stays

Exhibit 7 – Lies that there are no discount at the Waldorf Astoria, and then violation of consumer protection laws marketing a room at double the price, whereas the true value is the reduced rate, with evidence of substandard services

Request for assurance prior to booking to not encounter repeat of problems on June 26 2024

EXHIBIT 1

## Upcoming stay / feedback required

From:  ava (ad.nwos@yahoo.com)

To:  chris.song@conradhotels.com; nancy.orlarei@conradhotels.com

Date:  Wednesday, June 26, 2024 at 07:58 PM EDT

Dear Mr Song and Ms Orlarei

It is Ms Nwosu

I'll be in DC in the early hours of the morning owing to flight delays

I am going to go ahead and book a stay with the Conrad and give it another chance

I just want the confirmation that the feedback I gave re

1. Staff discipline and professionalism in the sakura lounge

2. Turn down service will be thorough and not skipped

Have been well received and dealt with as I do not wish to encounter the same problems.

I arrive on the 27th morning in the early am, I hope the early check in wont be a problem, please let me know if theres an additional early check in fee

I will go ahead and book the one bedroom suite - the next category up is the park view and both are available- I trust I should be able to avail of my complimentary upgrade as a diamond member.

If you dont feel the staff are ready yet/ issues I raised are yet to be resolved, please advise on-time, I'll be happy to stay elsewhere . I just ask that you cancel without charging.

Thanks

Ms Nwosu

Sent from Yahoo Mail for iPhone

**From:** ava <ad.nwos@yahoo.com>
**Sent:** Sunday, June 30, 2024 7:19 PM
**To:** Odingas Anyabuike <odingas.anyabuike@conradhotels.com>
**Cc:** Chris Song <chris.song@conradhotels.com>
**Subject:** Poor Experience - Again

I'll check out tomorrow. I called the waldorf and all their managers are not back until tomorrow. Ill have to chrck out in the evening after I'm done with the day to not be disruptive, since all of this was unexpected.

I fully expect my refund of my entire stay because the issues I had mentioned still reoccurred. ie staff took food from the buffet and snuck into the bathroom into the lounge to eat… this lurking behavior occurred repeatedly on my stay and was reported Thus, no distractions tomorrow. I paid $2500+ and 182,000 points ($1000 equivalent).

Please remind Ms Yvette to speak with the Director of Rooms, Mr Neil at the Waldorf dyeing the day - not the front desk manager, David.

I'll follow up with a formal complaint to your corporate office directly at my next opportunity because this seems to be a company wide problem.


Ms Nwosu

Sent from Yahoo Mail for iPhone

---

This transmission is not a digital or electronic signature and cannot be used to form, document, or authenticate a contract. Hilton and its affiliates accept no liability arising in connection with this transmission. Copyright 2024 Hilton Proprietary and Confidential

Fraud by Chris, he assured you, then defrauded you as problems persisted on June 30 2024.

Re: Poor Experience - Again

From:  Chris Song (chris.song@conradhotels.com)

To:  ad.nwos@yahoo.com; odingas.anyabuike@conradhotels.com

Cc:  alejandra.vela@conradhotels.com; neil.suan@waldorfastoria.com

Date:  Sunday, June 30, 2024 at 07:42 PM EDT

Good evening Ms. Nwosu.

I am disheartened to hear that your stay with us has presented issues that have resulted in a request for early departure. A solution forward response is always our posture and it has been expressed by the team. With myself wanting to find a solution with the room being too hot.

As an alternative or solution could not be met, I would be happy to check out the room tomorrow with a wavier to an early departure fee as a gesture of goodwill. A full refund at this time would not be available as facilities have been utilized.

I have copied on Neil from Waldorf Astoria to provide him with a lead on your request for a room. Additionally, I have included Alejandra for visibility.

I sincerely appreciate your feedback to us.

Thank you.

**CHRIS SONG**
Assistant Director of Front Office
**Conrad Washington, DC  I Estuary I Summit**
950 New York Avenue, NW
Washington, DC 20001

**Email:** chris.song@conradhotels.com
**T** 202.844.5900 **M** 202.215.9128



Fw: Re:

From:  ava (ad.nwos@yahoo.com)

To:     yvette.faulk@conradhotels.com

Date:  Sunday, June 30, 2024 at 09:12 PM EDT

Please see the history of the complaint on just this stay.

Sent from Yahoo Mail for iPhone

Begin forwarded message:

On Friday, June 28, 2024, 6:26 PM, ava <ad.nwos@yahoo.com> wrote:

Fyi - Alejandra please check your phone

Sent from Yahoo Mail for iPhone

Begin forwarded message:

On Friday, June 28, 2024, 5:14 PM, ava <ad.nwos@yahoo.com> wrote:

I sent you an email at 12:27 of the request among others, it's in the trail and it's the ac in the living room that's faulty

Sent from Yahoo Mail for iPhone

On Friday, June 28, 2024, 5:01 PM, Nancy Orlarei <Nancy.Orlarei@conradhotels.com> wrote:

Good day

The AC in the bedroom I will advise the team.

We can have the team collect the laundry, if the team was not informed they would have not gone to the room.

Nancy

**NANCY C. ORLAREI**
Director of Rooms & Guest Services

**Conrad Washington, DC**
950 New York Avenue NW
Washington, DC 20001

Hotel: 202 844 5900
Direct: 202 844 5889
Mobile: 347 410 1824
Nancy.orlarei@conradhotels.com

**From:** ava <ad.nwos@yahoo.com>
**Sent:** Friday, June 28, 2024 4:56 PM
**To:** Nancy Orlarei <Nancy.Orlarei@conradhotels.com>
**Subject:** Re: Re:

I'm back to the room and the air isn't cooling well still…
The laundry wasn't picked up either…

Is there any reason?
Sent from Yahoo Mail for iPhone

On Friday, June 28, 2024, 1:44 PM, Nancy Orlarei <Nancy.Orlarei@conradhotels.com>
wrote:

Good day

I placed a call for the engineering team to take care of it.

Nancy

**NANCY C. ORLAREI**
Director of Rooms & Guest Services

**Conrad Washington, DC**
950 New York Avenue NW
Washington, DC 20001

Hotel: 202 844 5900
Direct: 202 844 5889
Mobile: 347 410 1824
Nancy.orlarei@conradhotels.com



**From:** ava <ad.nwos@yahoo.com>
**Sent:** Friday, June 28, 2024 12:29 PM
**To:** Nancy Orlarei <Nancy.Orlarei@conradhotels.com>
**Subject:** Re: Re:

Please also fix the air conditioning in the living room. It doesn't cool properly and
struggles. thank you

Sent from Yahoo Mail for iPhone

On Friday, June 28, 2024, 12:27 PM, ava <ad.nwos@yahoo.com> wrote:

Nancy

Im going to copy Chris and Alejandra on this...because I mentioned this is an HR issue that I dont think they can fix before my next stay, though they assured me.

I know it is not the standard. Even in quote/unquote third world countries like Nigeria where I'm from, the f&b manager of the hilton told me they throw away the remaining food from the buffet. Staff food never mixes with guests food. They dont even drink the same bottled waters reserved for guest. On the last stay, I have seen one of waiters drink the sparkling s.pelli reserved for guests, but this hasn't happened again since I've been here.

I saw the lady at the desk sneak food away as I was leaving, it's your staff today.

Once staff start sharing what is meant for guests happens staff get entitled, standards drop as they stop placing guests first, in fact the staff who do this today cant even greet me properly. They greet me begrudgingly.

This is not my battle to fight but unless Hilton has another pathway that they publish publicly where staff get the same benefits a paying hotel guests pays, you're going to have to refund this 3000$ and 182,000 points I earned and paid to qualify for these benefits I apparently share with staff.

I have a lot laundry and dry cleaning - its in a red bag

Coco is in the room, please can Nesi the housekeeper clean the room because she is familiar with Coco

We also need a dog tag for the door

Thank you

Sent from Yahoo Mail for iPhone

On Friday, June 28, 2024, 11:06 AM, Nancy Orlarei <Nancy.Orlarei@conradhotels.com> wrote:

Good morning

**Absolutely not this is not our standards.**

May you share with me if it was one of of the lounge attendants or others.

Thank you

Nancy C. Orlarei
Director of Rooms
Conrad Washington DC
nancy.orlarei@conradhotels.com
347-410-1824

On Jun 28, 2024, at 10:59 AM, ava <ad.nwos@yahoo.com> wrote:

Are lounge staff allowed to eat lounge food before 11am?

Sent from Yahoo Mail for iPhone

---

This transmission is not a digital or electronic signature and cannot be used to form, document, or authenticate a contract. Hilton and its affiliates accept no liability arising in connection with this transmission. Copyright 2024 Hilton Proprietary and Confidential

# CONRAD
## ALGARVE

*NEVER JUST STAY. STAY INSPIRED.*

**2ª VIA**

| | | | |
|---|---|---|---|
| **Número/***Folio No* | : FR FAOAP/38087 | Miss Adaeze Ireoma Nwosu | |
| **Data /***Date* | : 2024-05-16 | Maryland | |
| **Página/***Page* | : 1 de/*of* 4 | Silver spring  20902 | |
| | | Nigeria | |
| | | **N.º Contribuinte/***Tax ID* | Consumidor final |
| **Quarto/***Room No* | : 530 | **Hóspede/***Guest* | : |
| **Chegada/***Arrival* | : 2024-05-07 | **N.º Memb/***Memb. No* | : XXXXXX1877 |
| **Saída/***Departure* | : 2024-05-16 | | |
| **Adultos/***Adults* | : 1 **Cria./***Child.* : 0 | **Empresa/***Company* | : |
| **Conf. N.º/***Conf. No* | : 550588 | **Referência /** *Reference* | : |
| **Caixa N.º/***Cashier No* | : 51 | **Voucher/***Voucher No* | : |

| Data/*Date* | IVA VAT | Descrição/*Description* | Qtd./*Qtt* | Valor/*Amount* EUR | Ajustes /*Adjusts* EUR | Saldo /*Balance* EUR |
|---|---|---|---|---|---|---|
| 2024-05-07 | | Visa Card<br>530 Adaeze Ireoma Nwosu | 1 | | 5,880.00 | -5,880.00 |
| 2024-05-07 | 6% | Alojamento \| Room only<br>530 Adaeze Ireoma Nwosu | 1 | 840.00 | | -5,040.00 |
| 2024-05-07 | 6% | Pet Supplement/ Animal Est. Suplemento<br>530 Adaeze Ireoma Nwosu<br>Daily Pet Supplement | 1 | 50.00 | | -4,990.00 |
| 2024-05-08 | 6% | Alojamento \| Room only<br>530 Adaeze Ireoma Nwosu | 1 | 840.00 | | -4,150.00 |
| 2024-05-08 | 6% | Pet Supplement/ Animal Est. Suplemento<br>530 Adaeze Ireoma Nwosu<br>Daily Pet Supplement | 1 | 50.00 | | -4,100.00 |
| 2024-05-09 | | Visa Card<br>530 Adaeze Ireoma Nwosu | 1 | | 500.00 | -4,600.00 |
| 2024-05-09 | 6% | Alojamento \| Room only<br>530 Adaeze Ireoma Nwosu | 1 | 840.00 | | -3,760.00 |
| 2024-05-09 | 6% | Pet Supplement/ Animal Est. Suplemento<br>530 Adaeze Ireoma Nwosu<br>Daily Pet Supplement | 1 | 50.00 | | -3,710.00 |
| 2024-05-10 | 6% | Alojamento \| Room only<br>530 Adaeze Ireoma Nwosu | 1 | 840.00 | | -2,870.00 |
| 2024-05-10 | 6% | Pet Supplement/ Animal Est. Suplemento<br>530 Adaeze Ireoma Nwosu<br>Daily Pet Supplement | 1 | 50.00 | | -2,820.00 |

ATCUD: JFXJD5MZ-38087

okmm-Processado por prog. certificado N.º1223-AT/Processed by certified prog. N.º1223-AT

Saldo a transportar/Balance Carried Forward:-2,820.00

**Conrad Algarve Hotel Apartamento Estrada da Quinta do Lago, 8135-106 Almancil**

t. +351 289350700 f. +351289350705 conradalgarve.com

Growing Together - Administração de Empreendimentos Turísticos SA. Contribuinte Nº 510089747 Capital Social - 50.000,00Eur

# C O N R A D
ALGARVE

*N E V E R   J U S T   S T A Y .   S T A Y   I N S P I R E D .*

Saldo transportado/Balance Brought Forward:-2,820.00

**2ª VIA**
**Número/***Folio No*        : FR FAOAP/38087
**Data /***Date*             : 2024-05-16
**Página/***Page*            : 2 de/*of* 4

Miss Adaeze Ireoma Nwosu
Maryland
Silver spring  20902
Nigeria
**N.º Contribuinte/***Tax ID*      Consumidor final

| Data/*Date* | IVA VAT | Descrição/*Description* | Qtd./*Qtt* | Valor/*Amount* EUR | Ajustes /*Adjusts* EUR | Saldo /*Balance* EUR |
|---|---|---|---|---|---|---|
| 2024-05-11 | 6% | Alojamento \| Room only<br>530 Adaeze Ireoma Nwosu | 1 | 840.00 | | -1,980.00 |
| 2024-05-11 | 6% | Pet Supplement/ Animal Est.<br>Suplemento<br>530 Adaeze Ireoma Nwosu<br>Daily Pet Supplement | 1 | 50.00 | | -1,930.00 |
| 2024-05-12 | 6% | Alojamento \| Room only<br>530 Adaeze Ireoma Nwosu | 1 | 840.00 | | -1,090.00 |
| 2024-05-12 | 6% | Pet Supplement/ Animal Est.<br>Suplemento<br>530 Adaeze Ireoma Nwosu<br>Daily Pet Supplement | 1 | 50.00 | | -1,040.00 |
| 2024-05-13 | 6% | Alojamento \| Room only<br>530 Adaeze Ireoma Nwosu | 1 | 840.00 | | -200.00 |
| 2024-05-13 | 6% | Pet Supplement/ Animal Est.<br>Suplemento<br>530 Adaeze Ireoma Nwosu<br>Daily Pet Supplement | 1 | 50.00 | | -150.00 |
| 2024-05-14 | | Visa Card<br>530 Adaeze Ireoma Nwosu | 1 | | 5,880.00 | -6,030.00 |
| 2024-05-14 | 6% | Alojamento \| Room only<br>530 Adaeze Ireoma Nwosu | 1 | 840.00 | | -5,190.00 |
| 2024-05-14 | 6% | Pet Supplement/ Animal Est.<br>Suplemento<br>530 Adaeze Ireoma Nwosu<br>Daily Pet Supplement | 1 | 50.00 | | -5,140.00 |
| 2024-05-14 | | Visa Card<br>530 Adaeze Ireoma Nwosu | 1 | | 15.55 | -5,155.55 |
| 2024-05-15 | 6% | Alojamento \| Room only<br>530 Adaeze Ireoma Nwosu | 1 | 840.00 | | -4,315.55 |

ATCUD: JFXJD5MZ-38087
okmm-Processado por prog. certificado N.º1223-AT/Processed by certified prog. N.º1223-AT
Saldo a transportar/Balance Carried Forward:-4,315.55
**Conrad Algarve Hotel Apartamento Estrada da Quinta do Lago, 8135-106 Almancil**
t. +351 289350700 f. +351289350705 conradalgarve.com
Growing Together - Administração de Empreendimentos Turísticos SA. Contribuinte Nº 510089747 Capital Social - 50.000,00Eur

 Gmail

**Conrad Algarve - Credit Limit**

**PEDRO FERREIRA** <PEDRO.FERREIRA@conradhotels.com>
To: "ireoma@gmail.com" <ireoma@gmail.com>
Cc: "conradalgarve.frontdesk" <conradalgarve.frontdesk@conradhotels.com>, Eleonora Scorza <Eleonora.Scorza@conradhotels.com>

Dear Mr. Allen,

I hope this email finds you well, and that you are enjoying your stay at the Conrad Algarve, it is a pleasure to have you with us in such a special occasion!

We would like to bring to your attention that the credit card, linked to your account with us, has reached it's security limit.

To rectify this issue, we kindly request you to visit our front office at your earliest convenience to extend the credit limit on your card. Our front office staff will be more than

If you have any concerns or queries, please do not hesitate to contact our front desk by contacting number 9 on your room phone. We appreciate your prompt attention to

Thank you for your cooperation.

Best regards,

Miguel Ferreira I Front Office Junior Supervisor
**Conrad** Algarve | Estrada da Quinta do Lago | 8135-106 Almancil, Portugal
t. +351 289 350 752 | f. +351 289 350 762
o. conradalgarve.frontdesk@conradhotels.com
W: www.hilton.com/en/hotels/faoapci-conrad-algarvo/
Video: Conrad Algarve Video





**PEDRO FERREIRA** <PEDRO.FERREIRA@conradhotels.com>
To: "ireoma@gmail.com" <ireoma@gmail.com>
Cc: "conradalgarve.frontdesk" <conradalgarve.frontdesk@conradhotels.com>, Eleonora Scorza <Eleonora.Scorza@conradhotels.com>

Dear Miss. Nwosu,

Please accept our deepest apologies as the email has been sent with the wrong name of reference.

The email is in fact directed to you but there as been a mistake when writing your name Miss Nwosu.

Please accept our deepest apologies for this inconvenience.

Should you need any further queries or assistance, please do not hesitate to contact us.

Kind regards,
Miguel Ferreira I Front Office Junior Supervisor
**Conrad** Algarve | Estrada da Quinta do Lago | 8135-106 Almancil, Portugal
t. +351 289 350 752 | f. +351 289 350 762
o. conradalgarve.frontdesk@conradhotels.com
W: www.hilton.com/en/hotels/faoapci-conrad-algarvo/
Video: Conrad Algarve Video





Conrad Algarve Awards: [illegible small print]

---

**From:** PEDRO FERREIRA <PEDRO.FERREIRA@ConradHotels.com>
**Sent:** Monday, May 13, 2024 10:19 AM
**To:** ireoma@gmail.com <ireoma@gmail.com>
**Cc:** conradalgarve.frontdesk <conradalgarve.frontdesk@conradhotels.com>; Eleonora Scorza <Eleonora.Scorza@ConradHotels.com>
**Subject:** Conrad Algarve - Credit Limit

---

**A** <ireoma@gmail.com>                                            Tue, May 14, 2024 at 8:43 AM
To: PEDRO FERREIRA <PEDRO.FERREIRA@conradhotels.com>
Cc: Eleonora Scorza <Eleonora.Scorza@conradhotels.com>, "conradalgarve.frontdesk" <conradalgarve.frontdesk@conradhotels.com>

Hi

I did not authorize you to charge anything in file so dont do that again without my permission. That's a form of fraud. I really dislike when merchants do that.

I advised the front desk last night that I would come today at 3pm to pay for the next 7 days and leave a deposit for incidentals.

The card I will use you do not have my permission to keep the details on file.

I hope I have made myself clear

Thank you and regards

Ms Nwosu

---

**A** <ireoma@gmail.com>                                            Tue, May 14, 2024 at 9:03 AM
To: PEDRO FERREIRA <PEDRO.FERREIRA@conradhotels.com>
Cc: Eleonora Scorza <Eleonora.Scorza@conradhotels.com>, "conradalgarve.frontdesk" <conradalgarve.frontdesk@conradhotels.com>

Also it's so inappropriate to send personal details about guests electronically, already you mistook the names of guests, that error  can constitute  a breach of EU GDPR.

---

**A** <ireoma@gmail.com>                                            Tue, May 14, 2024 at 10:44 PM
To: PEDRO FERREIRA <PEDRO.FERREIRA@conradhotels.com>
Cc: Eleonora Scorza <Eleonora.Scorza@conradhotels.com>, "conradalgarve.frontdesk" <conradalgarve.frontdesk@conradhotels.com>

I see a charge of $753 i did not authorize on my account from Conrad Please reverse those charges immediately otherwise I'll sue.

---

**A** <ireoma@gmail.com>                                            Tue, May 14, 2024 at 10:47 PM
To: PEDRO FERREIRA <PEDRO.FERREIRA@conradhotels.com>

And I demand a written apology for the fraud

---

**A** <ireoma@gmail.com>                                            Tue, May 14, 2024 at 11:13 PM
To: PEDRO FERREIRA <PEDRO.FERREIRA@conradhotels.com>
Cc: Eleonora Scorza <Eleonora.Scorza@conradhotels.com>, "conradalgarve.frontdesk" <conradalgarve.frontdesk@conradhotels.com>

Additionally kindly share the receipt the $6000+ I paid yesterday and confirm that my diamondpoints for the $12.000 are posted today to my hilton honors account

On Wed, May 15, 2024 at 3:44 AM A <ireoma@gmail.com> wrote:

---

**Vera Machado** <Vera.Machado@conradhotels.com>                    Wed, May 15, 2024 at 11:47 AM
To: A <ireoma@gmail.com>
Cc: Eleonora Scorza <Eleonora.Scorza@conradhotels.com>, "conradalgarve.frontdesk" <conradalgarve.frontdesk@conradhotels.com>, PEDRO FERREIRA <PEDRO.FERREIRA@conradhotels.com>, Miguel Coelho <Miguel.Coelho@conradhotels.com>

Dear Ms Nwosu,

Thank you for your email earlier this morning.

We have carefully investigated the charges made and I would like to assure you that on May 9th you have a charge of €700.00 which was chipped & pinned by you at the desk on your VISA ....8647 (please see document in attachment), which was meant to pay the €500.00 for your pet and to open a credit in your account for incidentals in the amount of €200.00 as per your indication.

As for the payment done yesterday of €6080.00 which was destined to pay accommodation for 7 more nights as agreed with Miguel in the amount of €5880.00) plus additional €200.00 credit for any other incidentals that may occur please find the respective in attachment as per your request.

I hope we have clarified any question and please do not hesitate to contact us should you need further assistance.

Wishing you a lovely evening.

Kind regards


Vera Machado | **Front of House Manager**
Conrad Algarve | Estrada da Quinta do Lago | 8135-106 Almancil, Portugal

t: +351 289 350 700 |
email: Vera.machado@conradhotels.com

w: www.hilton.com/en/hotels/faoapci-conrad-algarvo/






---

**2 attachments**

📎 **Ms Nwosu May 9th, 2024.pdf**
    127K

📎 **Ms. Nwosu May 14th, 2024.pdf**
    10K

---

**A** <ireoma@gmail.com>                                                                                      Fri, May 17, 2024 at 4:53 PM
To: Vera Machado <Vera.Machado@conradhotels.com>
Cc: Eleonora Scorza <Eleonora.Scorza@conradhotels.com>, Miguel Coelho <Miguel.Coelho@conradhotels.com>, PEDRO FERREIRA <PEDRO.FERREIRA@conradhotels.com>,
"conradalgarve.frontdesk" <conradalgarve.frontdesk@conradhotels.com>

I dont have a visa card ending it 8647.  You billed my other card for something i had already paid for. Like I said this is fraud and I'm filing a chargeback

EXHIBIT 2 CONT'D - DUPLICATIVE BILLING

Hilton Conrad Algarve
Estr. da Quinta do Lago
8135-106 Almancil
Tel: +351 289 350 700
Date: 09/16/24 08:24

TRV Merchant ID: 7308782
Terminal ID: 73078
Date Mid: 801901618
ISO ID: 8881759

\*\*\* A P P R O V E D \*\*\*

MERCHANT RECEIPT
ACCOUNT WILL BE DEBITED

TRANS TYPE.: Completion

Total amount: 788.00 EUR

CARD ID....: VS
PAN......: 491088xxxxxx8647
CARD ENTRY.: Manual
AID......: A0000000031010
EMV APP CHL: VISA DEBIT

REFERENCE NUMBER
556978

PIN Verified

Thank you
Please keep this receipt for
your records

EXHIBIT 3.

## Polizeiinspektion 21 München
(Au)

Polizeiinspektion 21 München (Au) · Postfach 330329 · 80063 München

Adaeze Nwosu
Anunihu Goddy Street 7
Owerri/Nigeria

| | |
|---|---|
| Your reference: | |
| Your message dated: | |
| Our reference: | BY8521-500703-23/5 |
| Our message dated: | |
| | |
| Officer in charge: | Zehnder, PM |
| Room: | |
| Phone number: | 089/62402 - 0 |
| Fax number: | 089/62402 - 128 |
| | |
| Date: | 31.05.2023 |

## *Confirmation That an Incident Has Been Reported*

| Date and time the incident was reported | Recorded by (name, rank, police station) |
|---|---|
| 31.05.2023, 19:26 Uhr | Zehnder, PM, PP München-PI 21 |

### Report made by

| Last name | | |
|---|---|---|
| Nwosu | | |

| Birth name | First name/middle name(s) |
|---|---|
| Nwosu | Adaeze, Ireoma |

| Date of birth | Place/county/country of birth |
|---|---|
| ███ | ███ |

| Address |
|---|
| ███ |

| Marital status | Occupation | Citizenship(s) |
|---|---|---|
| ledig | Geschäftsfrau | ███ |

### Concerning

| Incident: |
|---|
| Diebstahl (§ 242 StGB) |

| Time of incident/time frame of incident from to(date, time) |
|---|
| Samstag, 27.05.2023, 08:00 Uhr bis 27.05.2023, 11:30 Uhr |

| Place of incident (postal code, place, town, county, street/square, house number, floor, local court district) |
|---|
| 81669 München, Au-Haidhausen, Rosenheimer Straße 15 (G), Hilton München City, AG München |

### According to the person making the report, the following objects were

☒ stolen          ☐ damaged          ☐

| Object, detailed description of the object(s) (brand, kind, type, color, number(s), VIN, class(es), date of issue and issuing authority, etc.), number |
|---|
| Armschmuck, Armband, Florence, gold |

| | yes | no |
|---|---|---|
| A certificate of warranty, invoice, insurance policy or the like was presented. | ☐ yes | ☐ no |
| A fee of EUR 0.00 will be/was charged. | ☐ yes | ☒ no |

This confirmation may be submitted to authorities or insurance companies. It does not replace any form of identification or proof of authorization.

_____          _____
Zehnder, PM                                      Adaeze Nwosu

| Office address | Stop | Phone number (operator) | E-mail address |
|---|---|---|---|
| Am Neudeck 1 | Haltestelle Mariahilfpl. | 089/62402-0 | pp-mue.muenchen.pi21@polizei.bayern.de |
| 81541 München | Straßenbahn 18 | fax number | internet |
| | MetroBus 52 | 089/62402-128 | www.polizei.bayern.de |

IBP 023 (2018-06-22) IGVP

EXHIBIT C

 Gmail

A <ireoma@gmail.com>

---

## Disgusting stay

7 messages

---

**A** <ireoma@gmail.com>                                                            Sat, Jul 13, 2024 at 3:13 PM
To: darius.gainesfoster@hilton.com

Hi there,  I'm writing to report  issues with my stay.
Unfortunately, I'm dismayed to report that this Hilton is really unclean. I walked my dog second night. I woke my
dog and I saw three rats outside of your premises but still on the property line and today as I was returning, I saw a
dead rat and these are well fed , big rats and not too far from the property.

I told the night duty manager when I saw them that id check out Saturday and he said the rats dont come inside…
So I thought I would just leave it but when I saw a dead one again today, I was so disgusted . It's the first hilton I
have stayed at and seen such.

Additionally, when I was checking in, I specifically asked whether I get daily house cleaning, including the
bathroom being cleaned and not just a touchup, And I was told the bathroom will be clean daily. I have a picture of
what the housekeeper did. It wasn't cleaned daily. I don't know what has been happening for the previous two
days I haven't been in, but at least for today , I was in and witnessed it. See attached

I'm supposed to check out on Sunday, but I am requesting to check out today  and  refund. I still have the $45
credit for today. I haven't used it just cause I haven't can't bring myself to eat.

Also some amenities available at other hiltons are just not available like ear bud cleaners. This is basic and its not
available even on request.

I want to refund and I have to put this in writing so in case any issues I have in writing all right thank you.


**image_123650291.JPG**
2750K

---

**Darius Gaines Foster** <Darius.GainesFoster@hilton.com>                          Sat, Jul 13, 2024 at 3:33 PM
To: A <ireoma@gmail.com>
Cc: DCASH-Front Office Managers <DCASH-Front_Office_Managers@hilton.com>

---

Hello Ms. Nwosu,

I want to extend my sincere apologies for the issues you encountered during your stay with

us. I understand your concerns about the presence of rats around the property. While we maintain strict cleanliness standards indoors and have not encountered any rodent problems inside, it's unfortunately common to see rats in the outdoor areas of our city, which is beyond our control.

Regarding your concerns about housekeeping, I will be addressing these issues directly with our Director of Housekeeping to ensure improvements are made.

Unfortunately, as you did not use the credit that was provided, we are unable to issue a refund for it. Additionally, since your reservation was made using partial points, a refund is not possible.

However, to compensate for the inconvenience you experienced, we are offering you a 20,000-point credit and are happy to waive any checkout fees. When you are ready to check out, please visit the front desk, and we will handle everything for you.

Thank you for your understanding.

**Darius Foster**
**Front Office Supervisor**
**CAPITAL HILTON**
1001 16th St NW, Washington, DC, 20036 USA
capitalhilton.com
hilton.com



---

**From:** A <ireoma@gmail.com>
**Sent:** Saturday, July 13, 2024 3:13 PM
**To:** Darius Gaines Foster <darius.gainesfoster@hilton.com>
**Subject:** Disgusting stay

Blocked text hidden

This transmission is not a digital or electronic signature and cannot be used to form, document, or authenticate a contract. Hilton and its affiliates accept no liability arising in connection with this transmission. Copyright 2024 Hilton Proprietary and Confidential

---

A <ireoma@gmail.com>                                              Sat, Jul 13, 2024 at 3:43 PM
To: Darius Gaines Foster <Darius.GainesFoster@hilton.com>
Cc: DCASH-Front Office Managers <DCASH-Front_Office_Managers@hilton.com>

One night was paid in cash, $385.00 so go ahead and refund that and release the $300 additional hold.

I dont want the points. There is a clear problem with Hilton and I specifically asked of the bathroom are cleaned

daily at this property and was told yes by your front desk staff. It's just fraud misrepresentation of services not a housekeeping director problem.

The rats are a reflection of the uncleanliness of the property

Also I forgot to mention

The HVAC doesn't shut off, I have a recording of the defect and with respect to the cleanliness, your coffee to go bar stores stagnant dirty water underneath the table, thats very unsanitary

I'll just put it again in writing, I want a refund of the cash portion paid and the cash equivalent of the points, if possible. I don't want make up 20,000 points for obvious defects

Ms. Nwosu

---

**Lamika Hughes** <Lamika.Hughes@hilton.com>                                    Sat, Jul 13, 2024 at 4:01 PM
To: A <ireoma@gmail.com>, Darius Gaines Foster <Darius.GainesFoster@hilton.com>
Cc: DCASH-Front Office Managers <DCASH-Front_Office_Managers@hilton.com>

Good afternoon Ms. Nwosu,

Your rodent encounter outside of our hotel while unfortunate, does not a represent our hotel. We strive daily to ensure the most flawless guest stays for each of our guests. We are happy that you choose to stay with us and are extremely disappointed to hear your stay did not meet your expectations. I have provided to you in a separate email your most current receipt. As noted, your first two night's room and tax totals $206.46. While I respectfully declined any further compensation outside of what has been offered, I do thank you for your time and feedback. We most certainly apologize for inconvenience you encountered while with us.

As you have advised the first office team of your intended 4pm departure today, we will, as promised, request to have any incidentals being held on your card (outside of the funds due), expedited back to you. Please note it is a request on our end however your financial institution will have the final approval.

We remain committed to providing a better experience for you in the future if afforded the opportunity. We would welcome the opportunity to make things right.

Best regards-

LaMika

**LAMIKA HUGHES**
**Director of Front Office**
lamika.hughes@hilton.com

**CAPITAL HILTON**

**Explore Our Conference Facilities:**

TAKE A TRUETOUR™

**This summer, uncover Washington DC's** *Hidden Gems*

Enjoy a specially curated summertime experience filled with unique DC attractions & activities!

**LEARN MORE**

Capital Hilton

---

**From:** A <ireoma@gmail.com>
**Sent:** Saturday, July 13, 2024 3:43 PM
**To:** Darius Gaines Foster <Darius.GainesFoster@hilton.com>
**Cc:** DCASH-Front Office Managers <DCASH-Front_Office_Managers@hilton.com>
**Subject:** Re: Disgusting stay

[Quoted text hidden]

---

A <ireoma@gmail.com>                                              Sat, Jul 13, 2024 at 4:09 PM
To: Lamika Hughes <Lamika.Hughes@hilton.com>
Cc: DCASH-Front Office Managers <DCASH-Front_Office_Managers@hilton.com>, Darius Gaines Foster <Darius.GainesFoster@hilton.com>

Rats was on your property line: in your gardens… There are rodents on your property- thats for the record.

Can you clarify you're not refunding the $385 cash paid either, whether for taxes and fees…

What exactly is being refunded and have the bellman com please in 10 minutes

Nwosu Nwosu

[Quoted text hidden]

---

Lamika Hughes <Lamika.Hughes@hilton.com>                         Sat, Jul 13, 2024 at 4:15 PM
To: A <ireoma@gmail.com>
Cc: DCASH-Front Office Managers <DCASH-Front_Office_Managers@hilton.com>, Darius Gaines Foster <Darius.GainesFoster@hilton.com>

Ms. Nwosu,

We authorized $642.78 during check in. The current balance due on your receipt is $312.04. That amount will be charged to your Visa. The difference between the two amounts is $330.74 which will return to you.

Our bellmen will be with you shortly.

Best regards-

LaMika

**LAMIKA HUGHES**
Director of Front Office
lamika.hughes@hilton.com

**CAPITAL HILTON**
d:  +1 202 639 5710 t: +1 202 393 1000
f: +1 202 639 5788
1001 16th St NW, Washington, DC, 20036 USA
capitalhilton.com
hilton.com

**Explore Our Conference Facilities:**

TAKE A TRUETOUR™



This summer, uncover Washington DC's Hidden Gems

Enjoy a specially curated summertime experience filled with unique DC attractions & activities!

LEARN MORE

Capital Hilton

**From:** A <ireoma@gmail.com>
**Sent:** Saturday, July 13, 2024 4:09 PM
**To:** Lamika Hughes <Lamika.Hughes@hilton.com>
**Cc:** DCASH-Front Office Managers <DCASH-Front_Office_Managers@hilton.com>; Darius Gaines Foster <Darius.GainesFoster@hilton.com>
**Subject:** Re: Disgusting stay

[Quoted text hidden]

---

**A** <ireoma@gmail.com>                                    Sat, Jul 13, 2024 at 4:56 PM
To: Lamika Hughes <Lamika.Hughes@hilton.com>

Ok so no refund on the rooms, noted.

[Quoted text hidden]

Exhibit 1

 **Gmail**

A <ireoma@gmail.com>

---

## Room reservations

13 messages

---

**A** <ireoma@gmail.com>                                                   Tue, Apr 16, 2024 at 11:03 AM
To: dionne.bryant@waldorfastoria.com

Hi Dionne

Are there any rooms available from the 16th - 20th April 2024?
For 1 person

Thanks
Ms Nwosu

---

**Dionne Bryant** <Dionne.Bryant@waldorfastoria.com>                        Wed, Apr 17, 2024 at 8:01 AM
To: A <ireoma@gmail.com>
Cc: DCAWA RES <DCAWA.RES@waldorfastoria.com>, DCAWA FO <DCAWA.FO@waldorfastoria.com>

Good morning,

Unfortunately, we were fully committed yesterday and today. I have attached our reservation team
DCAWA.RES@waldorfastoria.com to further assist you.

Sincerely,

Dionne

---

**From:** A <ireoma@gmail.com>
**Sent:** Tuesday, April 16, 2024 11:03:20 AM
**To:** Dionne Bryant <dionne.bryant@waldorfastoria.com>
**Subject:** Room reservations

[Quoted text hidden]

---

This transmission is not a digital or electronic signature and cannot be used to form, document, or authenticate a contract. Hilton and its affiliates accept
no liability arising in connection with this transmission. Copyright 2024 Hilton Proprietary and Confidential

---

**A** <ireoma@gmail.com>                                                   Sat, Jun 1, 2024 at 3:47 AM
To: DCAWA.RES@waldorfastoria.com, Dionne Bryant <dionne.bryant@waldorfastoria.com>

Hi Dionne

What are your long term rates for a long stay, 2 weeks - I usually stay in 721. I see there's availability. From June 4 +/-
2 days

Thanks

Ms Nwosu
[Quoted text hidden]

---

**Kaylynn Stevenson** <Kaylynn.Stevenson@waldorfastoria.com>                Mon, Jun 3, 2024 at 11:52 AM
To: A <ireoma@gmail.com>, DCAWA RES <DCAWA.RES@waldorfastoria.com>, Dionne Bryant
<Dionne.Bryant@waldorfastoria.com>

Dear Ms. Nwosu,

Greetings from our in-house Reservations Team! We are delighted to assist you with rate accommodations for June 4th, 2024.

When time permits, kindly provide your anticipated departure date. We look forward to your reply!

Kind Regards,

### KAYLYNN STEVENSON

RESERVATIONS AGENT

1100 Pennsylvania Avenue NW

Washington, District of Columbia 20004 USA

+1 2026951100  Tel:

+1 2028685163  Direct:

waldorfastoriawashingtondc.com

ⓘ f  @waldorfastoriawashingtondc



[Quoted text hidden]

---

**A** <ireoma@gmail.com>                                                    Mon, Jun 3, 2024 at 12:15 PM
To: Kaylynn Stevenson <Kaylynn.Stevenson@waldorfastoria.com>
Cc: DCAWA RES <DCAWA.RES@waldorfastoria.com>, Dionne Bryant <Dionne.Bryant@waldorfastoria.com>

Right now its looking like a two week stay. Until the 18th june 2024
[Quoted text hidden]

---

**Kaylynn Stevenson** <Kaylynn.Stevenson@waldorfastoria.com>              Mon, Jun 3, 2024 at 12:30 PM
To: A <ireoma@gmail.com>
Cc: DCAWA RES <DCAWA.RES@waldorfastoria.com>, Dionne Bryant <Dionne.Bryant@waldorfastoria.com>

Dear Ms. Nwosu,

Thank you for confirming! Please see an overview of our best available rates for June 4th - 18th, 2024.

Kindly let us know how you wish to proceed. We look forward to your response.

## Rates

Premium Two Queen Beds Guestroom – $1,175

Grand Two Queen Beds Guestroom – $1,297

One King Bed Junior Suite – $2,215

One Bedroom Suite with Extra Half Bath – $2,915

Pennsylvania Ave One Bedroom Suite – $5,989

Postmaster One Bedroom Suite – $7,489

Capitol One Bedroom Suite – $7,489

Franklin One Bedroom Suite – $10,078


## Description

**Premium 2 Queens Guestroom**

- Bright and airy 400 to 585 sq. ft. room with thoughtful historic detailing, an additional sitting area, crisp wood millwork, sparkling chandeliers, classically furnished décor.

**Grand 2 Queens Guestroom**

- Bright and oversized, these 480 to 558 sq. ft. guestrooms provide city views, beautiful and classically furnished décor and an executive desk.
- Well-appointed, crisp wood millwork, sparkling chandeliers and modern amenities blend to create a soothing environment in the city's heart.

**Junior Suite with King Bed**

- Spacious and light-filled, these King 530 to 690 sq. ft. suites offer city views, an extra sitting area, lovely classically furnished decor, and an executive desk.
- Well-appointed historical touches like crisp wood millwork and sparkling chandeliers merge with modern amenities, forming a relaxing atmosphere.

**One Bedroom Suite with Extra Half Bath**

- 713 to 967 square feet located on the hotel's higher floors.
- Boasting multiple windows for a bright, airy feeling, each suite is slightly different to highlight the historical touches that blend seamlessly with modern amenities to offer a calm, inviting atmosphere.
- The beautifully appointed living room features a comfortable sitting area. Retire to the large bedroom offers a seating area and luxurious king-sized bed.

**Pennsylvania Ave One Bedroom Suite**

- Located on the north side of the property with views overlooking famed Pennsylvania Avenue, this 1,500 sq. ft. light-filled one-bedroom suite features a separate living room, fitness area, executive desk and well-appointed, oversized

**Postmaster One Bedroom Suite**

- Light filled and classically furnished, this 1,600 sq. ft. one-bedroom suite features a large living area, dining table for eight with a convenient service pantry and separate bedroom. The elegantly-appointed bedroom offers an executive desk and luxurious king-sized bed. Revel in the spa-like bathroom featuring double sinks with lovely, rich marble, deep soaking tub and glass-enclosed shower.

**Franklin One Bedroom Suite**

- Contemporary blue accents highlight the sunlit areas throughout this expansive 2,000 sq. ft. one-bedroom suite. This impeccable suite features a large living area, dining area for six, two luxurious marble baths, private study with an executive desk and separate fitness area. The large bedroom features a luxurious king-sized bed and walk-in closet. Revel in the spa-like bathroom featuring double sinks with lovely, rich marble, deep soaking tub and glass-enclosed shower.

**Capitol One Bedroom Suite**

- Overlooking Pennsylvania Avenue offering magnificent views of the U.S. Capitol Building, this 1,645 sq. ft. suite features two full marble bathrooms, a large living room with an executive desk, oversized windows and separate bedroom. The large bedroom consists of a luxurious king-sized bed and spacious walk-in closet. Revel in the spa-like bathroom featuring double sinks with lovely, rich marble, deep soaking tub and glass-enclosed shower. This suite can be combined with an adjoining guestroom for a two-bedroom 2,100 sq. ft. suite.

**Overview**

1. Check In 4:00 PM, Check Out 12:00 PM
2. Valet Parking $65.00 per night
3. Pets allowed, $250.00 non-refundable fee
4. Signature Suites – Non-Refundable One Night Deposit
5. Cancellation Policy – Change or Cancel up to 2 Days prior to arrival
6. Tax 15.95% per room, per night
7.

[Quoted text hidden]

---

**Kaylynn Stevenson** <Kaylynn.Stevenson@waldorfastoria.com>          Mon, Jun 3, 2024 at 12:31 PM
To: A <ireoma@gmail.com>
Cc: DCAWA RES <DCAWA.RES@waldorfastoria.com>, Dionne Bryant <Dionne.Bryant@waldorfastoria.com>

[Quoted text hidden]

Kind Regards,


### KAYLYNN STEVENSON

RESERVATIONS AGENT


1100 Pennsylvania Avenue NW

Washington, District of Columbia 20004 USA


+1 2026951100  Tel:

+1 2028685163  Direct:


waldorfastoriawashingtondc.com

📷 f  @waldorfastoriawashingtondc



**From:** A <ireoma@gmail.com>
**Sent:** Monday, June 03, 2024 12:15 PM
**To:** Kaylynn Stevenson <Kaylynn.Stevenson@waldorfastoria.com>
**Cc:** DCAWA RES <DCAWA.RES@waldorfastoria.com>; Dionne Bryant <Dionne.Bryant@waldorfastoria.com>
**Subject:** Re: Room reservations

Right now its looking like a two week stay. Until the 18th june 2024

[Quoted text hidden]

---

A <ireoma@gmail.com>                                                                 Mon, Jun 3, 2024 at 3:11 PM
To: Kaylynn Stevenson <Kaylynn.Stevenson@waldorfastoria.com>
Cc: DCAWA RES <DCAWA.RES@waldorfastoria.com>, Dionne Bryant <Dionne.Bryant@waldorfastoria.com>

Hi there

These appear to be the same online rates with no discount.
[Quoted text hidden]

---

Kaylynn Stevenson <Kaylynn.Stevenson@waldorfastoria.com>                    Mon, Jun 3, 2024 at 3:15 PM
To: A <ireoma@gmail.com>
Cc: DCAWA RES <DCAWA.RES@waldorfastoria.com>, Dionne Bryant <Dionne.Bryant@waldorfastoria.com>

Dear Ms. Nwosu,

Thank you for prompt response. This is correct. The rates quoted are the best available rate selling online during your requested dates. Please let us know if you have any further questions.

[Quoted text hidden]

---

A <ireoma@gmail.com>                                                                 Mon, Jun 3, 2024 at 4:49 PM
To: Kaylynn Stevenson <Kaylynn.Stevenson@waldorfastoria.com>
Cc: DCAWA RES <DCAWA.RES@waldorfastoria.com>, Dionne Bryant <Dionne.Bryant@waldorfastoria.com>

 No the rates you quoted are more expensive than the app, its not even the best available rate.

Also I'm particular about what rooms I stay in especially for an extended stay so I need to know that 1 my upgrade as a diamond member is secure

2. Its a room on a higher floor with a view

3. There's a sizeable tub in a spacious bathroom

These are the reasons I contact in advance. I specifically asked for room 721 or similar

Please forward my request to the director of rooms or the front desk manager who can actually assist.

Thank you

Ms Nwosu
[Quoted text hidden]

---

A <ireoma@gmail.com>                                                                 Mon, Jun 3, 2024 at 5:00 PM
To: Kaylynn Stevenson <Kaylynn.Stevenson@waldorfastoria.com>
Cc: DCAWA RES <DCAWA.RES@waldorfastoria.com>, Dionne Bryant <Dionne.Bryant@waldorfastoria.com>

I forgot to add there are special rates there is even provision for it in the app, including corporate etc - and I know these are given so I'm not catching what you're throwing at me with these higher rates
[Quoted text hidden]

**Octavia Yemariamfere** <Octavia.Yemariamfere@waldorfastoria.com>                    Mon, Jun 3, 2024 at 5:05 PM
To: A <ireoma@gmail.com>, Kaylynn Stevenson <Kaylynn.Stevenson@waldorfastoria.com>
Cc: DCAWA RES <DCAWA.RES@waldorfastoria.com>, Dionne Bryant <Dionne.Bryant@waldorfastoria.com>

Good Afternoon Mrs. Nwosu,

We apologize for the inconvenience. We have no way of knowing that you are a Diamond Member via the email communications. Currently we are committed on Studio Suites during the dates you would like to stay with us. The Best Available Rate I have for a One Bedroom Suite is $2755 per night with the Hilton Honors Discount. With breakfast included, the rate will be $2772 per night. If you are using points for your stay, I encourage you to use the Hilton Honors app to redeem those points.

For particular corporate rates, please feel free to contact our Hilton Reservation Customer Center at 1(800)548-8690.

Thank you again for choosing to stay at the Waldorf Astoria, Washington DC. We look forward to hosting you.

Best,

Octavia Yemariamfere
Reservations Supervisor
1100 Pennsylvania Avenue NW
Washington, District of Columbia 20004 USA
Tel: (202)868-5065
waldorfastoriawashingtondc.com
@ f @waldorfastoriawashingtondc



**From:** A <ireoma@gmail.com>
**Sent:** Monday, June 3, 2024 4:49 PM
[Quoted text hidden]

[Quoted text hidden]

---

**A** <ireoma@gmail.com>                                                          Mon, Jun 3, 2024 at 11:54 PM
To: Octavia Yemariamfere <Octavia.Yemariamfere@waldorfastoria.com>
Cc: DCAWA RES <DCAWA.RES@waldorfastoria.com>, Dionne Bryant <Dionne.Bryant@waldorfastoria.com>, Kaylynn Stevenson <Kaylynn.Stevenson@waldorfastoria.com>

Ok thanks
[Quoted text hidden]

EXHIBIT 9 - LAPSES IN SERVICES @ WALDORF

Ms Nwosu

Sent from Yahoo Mail for iPhone

On Thursday, June 6, 2024, 11:51 AM, David Morrison <David.Morrison@waldorfastoria.com> wrote:

Good morning Ms. Nwosu,

Firstly, I want to apologize again for the inconveniences you have experienced since checking in. I have shared your feedback with the leadership team and you will be receiving a call from the Director of Housekeeping shortly regarding the opportunities you have had.
As promised, I have added $100.00 Hospitality Credit for your convenience. I am delighted to also offer a 25% discount on last night's rate and to extend your reservation until Monday, June 10th at the discounted nightly rate of $1,200.00 (discounted from $2,053.67). Please confirm that I can proceed with this.
Please do not hesitate to let me know if I may be of any further assistance and please know that your satisfaction is our highest priority.

Sincerely,

**David Morrison**
**Front Office Manager - Task Force**

1100 Pennsylvania Avenue NW
Washington, District of Columbia 20004
USA

**Tel:** +1 202 695 1100

waldorfastoriawashingtondc.com

This transmission is not a digital or electronic signature and cannot be used to form, document, or authenticate a contract. Hilton and its affiliates accept no liability arising in connection with this transmission. Copyright 2024 Hilton Proprietary and Confidential



**From:** ava <ad.nwos@yahoo.com>
**Sent:** Thursday, June 06, 2024 12:48 PM
**To:** David Morrison <David.Morrison@waldorfastoria.com>
**Cc:** Mallory Harney <Mallory.Harney@waldorfastoria.com>; DeShawn Abrams-Bynum <DeShawn.Abrams-Bynum@waldorfastoria.com>
**Subject:** Re: Guest experience

If I'm unable to get the basic service at $800/night, why would I then pay $1000+ ?

Sent from Yahoo Mail for iPhone

On Thursday, June 6, 2024, 12:32 PM, ava <ad.nwos@yahoo.com> wrote:

Hi there David

As I explained, I'm unable to accept a "compensation" on this stay, I stay frequently at the Waldorf here in DC, and usually I accept such gestures for lapses in quality standards.

I just can't  accept because lapses in standards is not what you're selling. Last night I really need a salt bath after a long international flight for tired muscles and I had to forfeit that, and I had poor sleep. When the bath salts eventually arrived at 4:45am after I had to enquire for the third time,  I then noticed the tub was not clean, just like the floors had not been vacuumed.

So I forfeited what I needed because of lapses in standards, a good nights sleep etc. So the gesture just will not cut it this time. The room should be clean al round without exception, the fact that you want to offer a discount for such a basic requirement of service is poor management resolution. By the way the bath tub is still not clean by the way, the hair is gone but remains.

 I also noticed that one of the more severe stains on the carpet has been removed, meaning the carpet just needed a routine cleaning and that too was not done.

I had also found garbage behind the work desk, this morning again but it has been removed now- again negligence

So the room was unclean, I stayed in an unclean room - for these reasons no, I cant accept a 25% off. It's totally unacceptable and I did bring it to your attention on time . I shouldn't even have had to report such because it shouldn't even have been so. So this has to stop happening, the fact that I am loyal doesn't mean management gets to take advantage with complacency and patchy resolutions.

Re - the extension. I'll go book in the app, your rate doesn't include my upgrade as a diamond member, but I do request that night is complimentary so you all can be serious about really raising the standards to a 5  star, and not being sloppy- and so I can finally have a bath.

I just need a confirmation that we are on the same page with regards to expectations of service standards and  the complimentary night so I can feel comfortable even booking again.

Regards

RE: Guest experience

From:   Mallory Harney (mallory.harney@waldorfastoria.com)

To:   ad.nwos@yahoo.com

Cc:   DeShawn.Abrams-Bynum@waldorfastoria.com; David.Morrison@waldorfastoria.com

Date:   Thursday, June 6, 2024 at 06:26 PM EDT

Good evening Ms. Nwosu,

Thank you for taking the time to discuss your experience so far with the property. We always strive to provide our guests in-residence with unforgettable experiences – and from the conversation below and the follow up I've had with the team, it is clear and evident that we are not hitting the mark with the start of this stay. For these things, we are truly sorry.

Our Director of Housekeeping, DeShawn Abrams-Bynum, attempted to connect several times with you today but did not want to disturb your activities. DeShawn wanted to remove last night's room and tax due to the room condition and services along with the extremely delayed bath salts. We completely understand how important rest and relaxation is after a long flight. To ensure your comfort, please confirm what time you would prefer your daily and evening services. To ensure that the room is relaxing and comfortable, we will have both a manager and a room attendant provide service so that the details are precise.

As previously stated, we will happily provide you with your current room through Monday at deeply reduced rate of $1,200.00 plus tax per evening. I have forwarded this correspondence to our Front Office Leadership team so they are able to assist in my absence this evening should you chose to accept. We'll happily take care of the logistics on your behalf. Please do not hesitate to let us know if we may be of any further assistance and please know that your satisfaction is our highest priority.

Kind Regards,

**MALLORY HARNEY**
**DIRECTOR OF FRONT OFFICE**

1100 Pennsylvania Avenue NW
Washington, District of Columbia 20004 USA

**Cell:** +1 202 322 2297

waldorfastoriawashingtondc.com
@ f @waldorfastoriadc

Certificate of Service

I certify that on the 22nd day of July 2024, I served all the defendants a copy of this complaint at:

1. Hilton WorldWide, Inc.
   1775 Tysons Blvd FL 7, McLean, VA, 22102 - 4285, USA
   <u>Registered Agent:</u>
   Corporation Service Company
   251 Little Falls Drive, Wilmington
   New Castle, DE, 19808
   ***Defendant 1***

2. Chris Song
   950 New York Ave NW, Washington, DC 20001
   ***Defendant 2***

3. Nancy Orlarei
   950 New York Ave NW, Washington, DC 20001
   ***Defendant 3***

4. Marriott International, Inc.
   7750 Wisconsin Avenue,
   Bethesda, MD, 20814
   <u>Registered Agent:</u>
   The Corporation Trust Incorporated
   2405 York Road
   Suite 201
   Lutherville Timonium MD 21093-2264
   ***Defendant 4***

5. The Ritz-Carlton Hotel Company, L.L.C.

   Registered Agent
   Corporation Trust Center 1209 Orange St, Wilmington, New Castle, DE 19801
   ***Defendant 5***

6. Roman Dauze
   Tysons Corner,
   1700 Tysons Corner Blvd,
   ***Defendant 6***

7. Emma Poplin
   3100 S St , NW, Washington, DC 20007
   ***Defendant 7***

8. Rishi Malhotra
   3100 S St , NW, Washington, DC 20007
   ***Defendant 8***

9. David Morrison
   1100 Pennsylvania Avenue NW, Washington, DC 20004

*Defendant 9*

Adaeze Nwosu, Plaintiff
1802 Vernon Street,
Washington DC 20009

*22 July 2024*